Lewis **BARLOW**, Individually and Lewis Barlow on behalf of Lewis Barlow and Manuel Steinhart, a Partnership

v.

**BRUNSWICK CORPORATION** and William J. Mosconi a/k/a Willie Mosconi.

Civ. A. No. 36089.

United States District Court, E. D. Pennsylvania.

April 3, 1970.

Levi, Mandel & Miller, Mitchell W Miller, Philadelphia, Pa., for plaintiffs.

Tom P. Monteverde, Philadelphia, Pa., for defendant Brunswick Corporation.

William L. Zeitz, Philadelphia, Pa., for defendant William J. Mosconi.

## OPINION

JOSEPH S. LORD, III, District Judge.

Plaintiff sued William J. Mosconi for damages allegedly resulting from his breach of an alleged oral contract with plaintiffs to produce a television series. Plaintiffs also sought compensatory and punitive damages from Brunswick Corporation ("Brunswick") for its alleged malicious interference with the contract. Jurisdiction is based upon diversity of citizenship.

Stated generally, the facts adduced at trial showed that on or about Labor Day, 1962, plaintiff Lewis Barlow, who was employed part-time as a producer for the Philadelphia NBC television station, and Manuel Steinhart met in Atlantic City to discuss Steinhart's idea for a television show based on billiards. In a format drafted on September 5, 1962, they dubbed their program "Championship Billiards." They contemplated filming matches between players of championship caliber in which the winner would receive proportionately more money than the loser. The matches would be described by a well-known personality, "like Willie Mosconi," who would be the "technical expert and with the host [would] provide a running description of the game." This format envisaged, *inter alia*, mounting a television camera directly over the billards table. Barlow and Steinhart formed a partnership called Sammet-Willow Productions, and later agreed to give Robert Goldy a 15 per cent interest in the partnership as compensation for his legal services in connection with their venture.[1]

Steinhart and Goldy met Mosconi for the first time at a luncheon meeting at Lew Tendler's Restaurant in Philadel-phia, Pa., on October 1, 1962. Mosconi expressed interest in the venture, and referred Goldy to his agent in New York City, a Mr. Alpert, now deceased. Subsequently, on October 21 and 22, a "pilot" show was video taped pursuant to an oral agreement that Mosconi would obtain two billiards players of championship caliber and select a "billiards parlor" for the taping; Mosconi provided the commentary for the match and was paid a $500 fee. The necessary equipment was rented from NBC. Thereafter, Goldy corresponded with a Mr. Wall, Mr. Alpert's attorney in New York, concerning the specifics of a contract covering the proposed series. These negotiations never reached fruition and no written contract was ever drafted. Plaintiffs argued that an oral agreement was reached concerning all the essential terms of a contract for a television series, and that Brunswick interfered with that contract by contracting with a professional television producer, Peter DeMet, for a complete 13-week television series which employed Mosconi. This series, they argued, rendered impossible Mosconi's performance of his oral contract with the partnership. Plaintiffs specifically conceded at the trial's outset that they were not claiming that Brunswick "pirated" their idea for "Championship Billiards."

After plaintiffs rested their case, both defendants moved for a directed verdict pursuant to F.R.Civ.P. 50(a); we granted Brunswick's motion but denied Mosconi's. The jury returned a verdict of $7,500 for plaintiffs against Mosconi. Presently before us are several motions: plaintiffs have moved for a new trial as to Mosconi on damages only because of the asserted inadequacy of the verdict; they also seek a new trial as to Brunswick, contending that our decision under Rule 50(a) was erroneous. Mosconi has moved for judgment notwithstanding the verdict pursuant to F.R.Civ.P. 50(b).

---

1. Because Messrs. Goldy and Barlow are partners and thus both parties in interest, we have decided to refer to all three members of the partnership as "plaintiffs" for the sake of simplicity, even though only Mr. Barlow is a named party.

## I

■ Plaintiffs' claim of an inadequate verdict is without merit. The partnership spent $4,214.85 to produce a "pilot" program to use as a sales device for the proposed television series. In addition, Messrs. Barlow and Goldy testified that they performed services for the venture for which they were not compensated. The jury's verdict of $7,500 was an eminently fair award for these items. Whether "Championship Billiards" would have been profitable was an issue on which there was strongly conflicting testimony. If plaintiffs' expert, Mr. "Bosh" Pritchard, had been believed, a more substantial verdict for lost profits would have been appropriate. But as Mosconi correctly points out, Mr. Pritchard's testimony had a weak factual basis, and was strongly disputed by the defendant's testimony that the Brunswick-sponsored television series of thirteen completed programs, professionally produced at a cost of about $75,000, was sold to only nine local stations out of 200 to 300 stations solicited from January 1964 through the last half of 1965. Accepting this testimony as a guide to lost profits, as a reasonable juror could have done, it is reasonable to conclude that plaintiffs' venture would have realized no profits at all. Plaintiffs' motion for a new trial on the issue of damages will be denied.

## II

Plaintiffs' contention that we should set aside our directed verdict in favor of Brunswick and grant a new trial as to that defendant appears to be three-pronged. First they argue that Brunswick had the affirmative burden of proving justification or privilege for interfering with their contract with Mosconi, and that it was therefore improper for

us to have directed a verdict under Rule 50(a) because of plaintiffs' failure to prove "malice" or lack of privilege. To support this contention plaintiffs quote extensively from legal treatises and secondary source material which purport to summarize Pennsylvania law treating this aspect of the tort. Brunswick disputes plaintiffs' reading of the material and relies on the Restatement of Torts, § 766, for the proposition that privilege is not an affirmative defense. That section provides:

"Except as stated in Section 698 [alienation of affection], one who, *without a privilege to do so*, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another is liable to the other for the arm caused thereby." (Emphasis added.)

■ The short answer to plaintiffs' argument is that the law of Pennsylvania, which plaintiffs assume is applicable,[2] casts the burden of proving lack of privilege on the plaintiff. In affirming a trial court's entry of judgment n. o. v., the Pennsylvania Supreme Court made the following observations concerning section 766 of the Restatement:

"The Special Note to comment m. in § 766 points out: 'There are frequent expressions in judicial opinions that "malice" is requisite for liability in the cases treated in this Section. But the context and course of decision make it clear that what is meant is not malice in the sense of ill will but merely purposeful interference without justification.' Our cases are in accord: Klauder v. Cregar, 327 Pa. 1, * * * Dora v. Dora, 392 Pa. 433, * * *.

---

2. Brunswick agrees that Pennsylvania law applies to plaintiffs' claim. We are thus not called upon to decide whether any conflict of laws problems exist under Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and Griffith v. United States Air Lines, Inc., 416 Pa. 1, 203 A.

2d 796 (1964). However, as Brunswick correctly observes, the law of the State of Illinois, Brunswick's principle place of business and the situs of Brunswick's alleged malicious interference, is, in fact, identical to Pensylvania's. *E. g.*, Loewenthal Securities Co. v. White Paving Co., 351 Ill. 285, 184 N.E. 310 (1932).

In *Birl* [Birl v. Philadelphia Elec. Co., 402 Pa. (1960)], we further stated (p. 301): '* * * the actor must act (1) for the purpose of causing the specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.' * *

"*It was appellant's duty to sustain the burden of proof of these elements* of the tort in this action * * *." Capecci v. Liberty Corp., 406 Pa. 197, 202, 176 A.2d 664 (1962). (Emphasis added.)

*Accord*, Snider v. McKean, 36 Pa.Dist. & Co.R.2d 203, 207–208 (1964) ("purposeful interference without justification" must be pleaded). This court thus had the affirmative obligation to scrutinize plaintiffs' proof to determine whether, as a matter of law, plaintiffs had failed to prove malice.

█ Plaintiffs' second argument is, naturally enough, that they did prove malice, or at least those facts from which the jury could infer it, and that this *prima facie* case was for the jury. Upon a review of the record, we are convinced that plaintiffs' proof not only fails to show malice, but in fact proves just the converse: that Brunswick's interference was privileged. As *Capecci, supra*, intimates, the Commonwealth follows the Restatement of Torts concerning malicious interference with contract. *See* Glazer v. Chandler, 414 Pa. 304, 307, 200 A.2d 416 (1964). Brunswick relies on the privilege provided in section 773 of the Restatement, which provides that

"One is privileged purposely to cause another not to perform a contract * * * with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract * * *."

While our research has disclosed no Pennsylvania cases explicating this privilege, the salient feature which the section requires is obvious: a legally protected interest which the interfering party believes will be impaired unless he acts.

█ The plaintiffs' own proof clearly showed that during their negotiations with him, Mosconi was under a long-term contract with Brunswick which called for payment of a minimum number of dollars to Mosconi in return for which Mosconi held himself available to Brunswick for the promotion and sale of its products and the performance of exhibitions designated by Brunswick. Further, Mr. Goldy testified at length to the type of restrictive covenant required of performers in the television industry, that these covenants were "standard procedure," and that he would have insisted that a restrictive covenant be included in the final Barlow-Mosconi contract. However, a restrictive covenant would have barred Mosconi from performing on any similar program for the commercial life of the series, including reruns. Such a covenant presents a *prima facie* conflict with the Brunswick-Mosconi contract, and sets out a *prima facie* case for the invocation of the Restatement's privilege, not a *prima facie* case of an unprivileged interference.

█ In an effort to rectify this situation, plaintiffs refer us to several other facts. Goldy testified that Mosconi represented to him that he, Mosconi, was free to appear in movies and on television, and that Brunswick did not require its prior consent to such appearances. Plaintiffs then argue that a jury could infer from that testimony that Brunswick had not reserved the right to withhold its consent to Mosconi's appearances, even though Mosconi did tell Goldy that when he, Mosconi, had acted as a consultant for the motion picture "The Hustler", he had secured Brunswick's permission to do so. However, plaintiffs overlook the fact that these statements are not binding on Brunswick, and were in fact admitted into evidence only after we had sustained Brunswick's counsel's objections to the admissibility of any statements by Mosconi concerning his relationship with Brunswick. None of Mosconi's statements to plaintiffs on this

topic was or could have been admitted for its truth as to Brunswick.

Plaintiffs next direct our attention to Goldy's testimony concerning the Barlow group's very first contact with Brunswick. Brunswick was first notified of the proposed series by the plaintiffs during their efforts to sell "Championship Billiards." Goldy testified that about 10 days after the pilot was completed, he called Warren Kelley, an employe of Brunswick, and told him about the contemplated series and Mosconi's participation in the venture. Goldy testified that Kelley ultimately agreed to have Brunswick look at the pilot and stated that "maybe we will be interested in it, maybe we won't," and that the only proviso Kelley mentioned was that Brunswick equipment had to be used "in anything that Mosconi does." Plaintiffs argue that a jury could infer from Kelley's failure to mention that Brunswick had a contractual right to require Mosconi to secure its consent (to Mosconi's participation in any television series featuring billiards) that no such right existed.

■ There are several difficulties with this argument. First, this inference is the only evidence plaintiffs presented which would support a jury finding of a lack of privilege, and is a woefully insufficient basis on which to present a case for the jury. Further, we are unconvinced that Brunswick was under any obligation to inform the Barlow group of its legal position at that time. The pilot was already filmed,[3] and plaintiffs were trying to sell it. Brunswick disclaimed interest in it, but, at Goldy's insistence, agreed to look at it if plaintiffs wanted to bring it to Chicago. Brunswick's accommodation in the matter ceased after seeing the pilot, however, and it not only refused to participate in any way in producing a series based on the pilot, but further indicated that it reserved the right to use Mosconi in a series of its own. Thus, as soon as Brunswick reached a decision about the Barlow pilot, and was first placed in a position where failure to disclose its claims might reasonably be expected to prejudice the Barlow group, it asserted what it believed to be its rights. The mere fact that Brunswick did not assert a contractual right at the parties' very first contact—Goldy's call to Kelley—does not support the inference that Brunswick did not possess that right.

Moreover, nothing in the subsequent sequence of events detracts from Brunswick's asserted privilege. After Brunswick declined to enter into any role in the production of the series, plaintiffs tried unsuccessfully to sell their idea to American Machine & Foundry ("AMF"), a company which sold billiards equipment. As part of their offer of "Championship Billiards", they relayed Mosconi's willingness to be employed by AMF at the termination of his Brunswick contract, which expired shortly. This selling effort is consistent with the plaintiffs' understanding of Brunswick's right to control Mosconi's appearances.

After AMF indicated that it had no current interest in the series or in employing Mosconi, plaintiffs began negotiations for the production of the series with television station WFIL in Philadelphia, and its affiliates in the Triangle Broadcasting chain. These negotiations proved fruitful. However, Goldy soon learned that Mosconi was to appear in another television series featuring billiards, and on February 1, 1963, Barlow called Mosconi to tell him of the arrangements with Triangle. Barlow testified that Mosconi denied he had any agreement with Barlow, and denied any knowledge of the contract's terms which Barlow told him they had agreed upon. When Barlow told Mosconi of Triangle's interest in producing the series, Mosconi said, "I can't do anything with you. We

3. Plaintiffs do not argue that the doctrine of estoppel (or laches) bars Brunswick's asserted privilege, nor do we consider that it does. With the pilot film a fact of life, Brunswick was only obliged to ensure that the Barlow group did not thereafter proceed without knowledge of Brunswick's position.

are going to do a series in Chicago with Peter DeMet and Brunswick." Barlow also testified that Mosconi told him that "he was getting substantial money from Brunswick and he had to do what they told him to do." Barlow then called Kelley in Chicago and Kelley confirmed what Mosconi had said. Kelley told Barlow that "[i]t is a fact that Willie cannot perform in your series," "[y]ou can't have Willie," and that "[i]f you were going to do a series you could use him as a consultant * * * off camera * * * in anything [you] did with Brunswick equipment," but that "other than that, * * * [the Barlow group] couldn't have his services." Not only is Barlow's testimony corroborative of Brunswick's privilege, but Goldy testified that when he called Mosconi on February 2, 1963, and told Mosconi that he had a contract with the Barlow group, Mosconi " * * * said that Brunswick won't give him permission to continue with our venture, they want him to do their series * * *."

Even more damaging to plaintiffs' case is plaintiffs' Exhibit 15, a letter dated February 20, 1963, from William L. Niemann, General Counsel for Brunswick, to Robert Goldy. After stating that the letter is in response to Goldy's letters of February 6th and 13th, 1963, and in confirmation of several telephone conversations with him, Niemann continues;

> "In the first place, Mr. Mosconi must secure the consent of the Brunswick Corporation before participating in any venture such as making a television 'pilot' or television series.
>
> "Second, on all occasions Mr. Warren Kelley has been completely candid with Messrs. Lewis Barlow and Emanual Steinhardt (sic) in stating Brunswick's position regarding the television 'pilot' which was produced by the Barlow group last year. Mr. Kelley on all occasions told the Barlow group that Brunswick was not interested in the series being discussed. Further, Kelley stated most emphatically that while we had no objection to Mosconi making the 'pilot' only, that

Brunswick would not consent to having Mosconi take part in the contemplated series either as an announcer, or as a participant, and that neither Mosconi's voice nor he, himself, could appear or be heard on the television series. Other than that, Brunswick had no objection to Mosconi's cooperating as an advisor in your venture and Brunswick would have been willing to provide tables, etc., as props. * * *

> "Sixth, under no construction of the facts can it be said that Brunswick has in any way misled your group or caused Mr. Mosconi to be uncooperative with your group. Instead, it seems to me the circumstances are the other way around and your group is trying to spirit Mr. Mosconi away from Brunswick."

In Hendler v. Cuneo Eastern Press, Inc., 279 F.2d 181 (C.A.2, 1960), the plaintiff publisher had purported to terminate a term contract which it had with the defendant printer, claiming that the printer had breached the contract. The publisher then entered into a contract for printing with a third party. However, the defendant wrote a letter threatening to sue the third party for damages if the third party induced the plaintiff to breach its contract with the defendant. As a result, the third party refused to perform its contract with the plaintiff, and the plaintiff, through a trustee in bankruptcy, sued the defendant printer for malicious interference with the third party contract. The court applied section 773 of the Restatement pursuant to state law which relied on "the general principle" of section 766 of the Restatement. Judge Learned Hand, writing for the court, held the defendant printer's actions privileged as a matter of law.

> " * * * In the case at bar the defendant had a 'legally protected interest' which it believed might be 'impaired' by the proposed contract * *, so that the section [§ 773] applies. Prosser on Torts (2d ed.), § 106, p. 737, gives as one instance of the privilege, 'a prior contract of his own.'

Carpenter, 41 Harv.L.Review, 746, says: 'The plaintiff's interest in freedom from interference with contract relations may be invaded with impunity by the defendant in protecting a contract right of his own.'"

■ The facts before us lead us to the same conclusion. Brunswick, pursuant to a prior contract, had paid and was paying Mosconi for the right to use his public image to promote Brunswick products and the Brunswick image, and for the right to designate his public appearances toward that end. In the bona fide belief that it had the right to limit his appearance to television productions which improved the Brunswick image (plaintiffs concede this to have been the purpose of the Brunswick contract, Plaintiffs' Brief, p. 19), Brunswick refused to permit Mosconi to perform in the Barlow series.

■ Plaintiffs apparently concede that the letter from Niemann to Goldy, Plaintiffs' Exhibit 15, is affirmative evidence of Brunswick's good faith assertion of its prior contractual right and that it establishes a privilege under the Restatement. Plaintiffs' Brief, p. 19. Their last argument is that we erred in not permitting them to withdraw the exhibit during oral argument on defendants' motions for directed verdicts. First, as we indicated at that time and have reiterated here, plaintiffs are "in trouble even without that evidence." Plaintiffs simply did not carry their burden of proving that Brunswick lacked a privilege or otherwise acted with malice. More to the point, however, we think our refusal to permit plaintiffs to withdraw P-15 was correct.

■ Plaintiffs' introduction into evidence of P-15 was part of a deliberate scheme to gain the admission into evidence of self-serving letters from plaintiffs to Brunswick. Plaintiffs contend that since we excluded their self-serving letters, they should have been permitted to withdraw P-15 from evidence after their case was closed. While we have discretion to permit a party to withdraw evidence where it has not been made known to the jury, Moyer v. Aetna Life Ins. Co., 39 F.Supp. 725, 728 (M.D.Pa., 1941), aff'd, 126 F.2d 141 (C.A.3, 1942), plaintiffs here had closed their case and were in the midst of oral argument on defendants' motions when the court first expressed its opinion concerning P-15 and plaintiffs' counsel first perceived the significance of the exhibit. The remedy of withdrawal of evidence normally should be sought immediately after a party discovers that he has misordered his proof or prematurely offered an exhibit. See, e. g., Moyer, supra. However, where a party has rested his case and thereby expressed his willingness to have the jury, and the court, consider his evidence, it would be an exceptional case indeed where the court would permit documents detrimental to a party's case to be deleted. Plaintiffs' proper remedy in this case was to seek a voluntary dismissal under F.R.Civ.P. 41(a) (2) if counsel considered his case badly weakened. See J. Moore's Federal Practice ¶ 41.05[1] (2d ed.1969). Plaintiffs did not and they were bound by their evidence. To permit a party, after resting his case, to edit his proof when the court directs his attention to weaknesses therein could only have a pernicious effect on the orderly proof and speedy disposition of litigation and would work to defeat operation of the equities expressed in Rule 41(a) (2). For all the foregoing reasons the plaintiffs' motion for a new trial as to Brunswick will be denied.[4]

---

4. Brunswick advanced several other reasons in support of its motion under Rule 50(a) in addition to a privilege to interfere. At the time of argument on its motion, we thought these other arguments lacked merit. We are now of a different opinion, but because we are convinced of the correctness of our reason for directing a verdict at that time, we do not now consider it necessary to review Brunswick's other grounds.

## III

Mosconi advances several reasons for his motion for judgment notwithstanding the verdict. We consider none of them since Mosconi failed to renew his motion for a directed verdict at the close of all the evidence. This failure precludes consideration of a motion under Rule 50(b). Massaro v. United States Lines Co., 307 F.2d 299 (C.A.3, 1962); Home Ins. Co. of New York v. Davila, 212 F.2d 731 (C.A.1, 1954).

Accordingly, we enter the following

## ORDER

1. The motion of plaintiff Lewis Barlow for a new trial as to defendant William J. Mosconi on the issue of damages is denied.

2. The motion of plaintiff Lewis Barlow for a new trial as to defendant Brunswick Corporation is denied.

3. The motion of defendant William J. Mosconi for judgment notwithstanding the verdict is denied. .