**EBASCO SERVICES INCORPORATED**

**v.**

**PENNSYLVANIA POWER AND LIGHT COMPANY**

**v.**

**GENERAL ELECTRIC COMPANY et al.**

**Civ. A. No. 72–1030.**

United States District Court,
E. D. Pennsylvania.

Aug. 28, 1975.

K. Robert Conrad, Jon A. Baughman, and Nancy J. Gellman, Philadelphia, Pa., for defendant Pennsylvania Power and Light.

Henry T. Reath, and Michael M. Baylson, Philadelphia, Pa., for third party defendant General Electric Co.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This matter is presently before us on the motion of third-party defendant General Electric Company (GE) for partial summary judgment. The original defendant, Pennsylvania Power and Light Company (PP&L), is a public utility which furnishes electric power to large areas of eastern and central Pennsylvania. Brunner Island in the Susquehanna River south of Harrisburg, Pennsylvania is the site of a large PP&L power plant complex. In 1964, recognizing the need to augment its generating capacity to meet the growing electric power needs of consumers and of industry, PP&L determined to erect an additional generating plant on Brunner Island to be known as Brunner Island # 3. On previous occasions PP&L had superintended the erection of its own power plants, letting various contracts and subcontracts for the several portions of the work. However, on this occasion the decision was made to engage Ebasco Services, Inc. (Ebasco), the original plaintiff herein, as a contractor, to undertake complete responsibility for construction of the plant on a so-called "turnkey basis"; i. e., Ebasco was to assume the responsi-

bility for design, selecting appropriate equipment and contractors, supervising the construction and testing, obtaining appropriate performance guarantees and overseeing all aspects of the project until the plant became operational, at which time the key might be turned over, as it were, to the owner PP&L. The PP&L-Ebasco agreement, entered into in 1964, was formally executed on March 10, 1966. Under the terms of the agreement PP&L was to pay Ebasco a total of $54,300,000 in installments over the construction period, with $3,640,000 retainage to be paid by PP&L only after it was satisfied that Ebasco had fulfilled the performance guarantees in the contract.

In March, 1964, Ebasco began the process of obtaining subcontractors for the plant. The remaining parties to this action, GE, Foster Wheeler Company (Foster Wheeler) and Combustion Engineering Company (Combustion), are firms which were engaged by Ebasco to furnish and install major components of the power plant. GE's principal contractual undertaking was to supply the steam turbine generator and boiler feed pump turbines, which could fairly be described as the heart of the power plant.

The power plant was ultimately completed in 1970. This litigation was commenced by Ebasco seeking some $1 million in retention moneys which PP&L had refused to disburse, plus an additional $1.6 million in expenses which Ebasco claimed it had incurred at PP&L's request, above the contract specification. PP&L counterclaimed against Ebasco for damages allegedly resulting from delay, use of unauthorized bidders, breach of warranty and negligence. PP&L, as third-party plaintiff, also joined GE, Foster Wheeler and Combustion as third-party defendants on its counterclaim.

PP&L's counterclaim against GE seeks damages allegedly resulting from (1) furnishing defective equipment; (2) negligence in the design and supervision of the installation of the steam turbine generator and boiler feed pump turbines; (3) breach of implied warranties; and (4) tortious interference by GE with certain of PP&L's contract rights. The total damages asserted by PP&L in its counterclaim approximate $64 million. The largest single element of damages is PP&L's claim against GE for the cost to PP&L of purchasing replacement power from other power companies in the Pennsylvania-New Jersey-Maryland Interconnection when Brunner # 3 did not function as anticipated.[1]

The litigation has become labyrinthine. It has also become massive in scope; indeed, there have already been produced for discovery some 100,000 documents, and depositions consuming hundreds of days have been taken. The present opinion addresses the motion of GE for partial summary judgment as to PP&L's claim against GE for alleged problems with the steam turbine generator and boiler feed pump turbines. More specifically, GE seeks to have us declare that it is not liable to PP&L on the steam turbine generator and boiler feed pump turbine contracts for: (1) cost of replacement power or lost profits; (2) breach of an alleged implied warranty of fitness for an intended use; and (3) tortious interference with the contractual rights of PP&L. Our decision on the motion must, of course, turn solely on the determination of whether genuine issues of material fact exist on the questions involved. The issues with which the motion deals evolve in large measure from the differing views of the parties as to what documents or acts form the contract between GE and Ebasco (the latter acting as agent for PP&L), and as to the terms of that contract.

1. In a document entitled PP&L's Preliminary Pre-Trial Statement, Exhibit B, PP&L has specified 127 separate defects in the power plant, allegedly the responsibility of GE, Foster Wheeler or Combustion. PP&L's claims against Foster Wheeler and Combustion are similar to those asserted against GE though lesser in amount. They total approximately $12 million against Foster Wheeler and $4.5 million against Combustion.

A brief preliminary background discussion is necessary in order to place the motion in perspective.

On July 15, 1964, acting pursuant to Ebasco's request, GE issued quotations for the steam turbine generator and the boiler feed pump turbines by means of a letter to Ebasco which stated, *inter alia*: "The above prices are based on our Standard Conditions of sale, price policy and price data as shown in GE Handbook 4710, dated May 25, 1964." Six days later Ebasco placed purchase order NY–668001 for the generator and turbines [2] and accompanied that order with a letter reading, in part: "A formal contract will be issued at a later date containing the terms and conditions of, and in the format of, the usual type of contract issued by Ebasco."

The GE terms and conditions differed significantly from those in the Ebasco standard contract in such important areas as warranties and remedies available to Ebasco (and therefore to its principal, PP&L), and negotiations continued between Ebasco and GE on these issues until December, 1967. At that time agreement was reached on language governing warranties and remedies, and the agreed upon language was included in Supplement 16 to the contract [2a] executed by GE and Ebasco on December 7, 1967. Significantly, while the negotiations were proceeding, GE had begun construction of the generator and by late 1967 that unit was nearing completion and delivery.

We have held an extensive hearing on GE's motion and have received voluminous briefs from both GE and PP&L with respect thereto.[3] The main points at issue are:

1. Is the language of limitation contained in Supplement 16 sufficient to insulate GE from PP&L's claims for cost of replacement power and lost profits and from claims predicated upon alleged breach of implied warranty?

2. Is there a genuine issue of material fact on the question whether PP&L obtained contractual rights pursuant to § 2–207 of the Uniform Commercial Code (U.C.C.) by virtue of the GE quotation of July 15, 1964, the Ebasco purchase order of July 21, 1964, and the events occurring thereafter but prior to December 7, 1967, the date upon which Supplement 16 was executed. If the foregoing question is answered affirmatively, the question then arises as to whether Ebasco had authority to impair PP&L's § 2–207 rights by executing Supplement 16. Put differently, is there a genuine issue of material fact as to whether PP&L is even bound by Supplement 16?

3. Is there a genuine issue of material fact on the question whether GE tortiously interfered with the contractual and/or fiduciary relationship between PP&L and Ebasco; and if there is a genuine issue of material fact on the question of tortious interference, is there also a genuine issue of material fact on the question of GE's privilege to interfere?

■ The first question posed (i. e., sufficiency of the language of limitation in Supplement 16) presents a matter of contractual interpretation which is for the Court. *Pittsburgh Ry. v. Equitable Life Assurance Soc'y*, 288 F.2d 640 (3d

---

2. GE furnished other components pursuant to other purchase orders, but these are not at issue on the present motion which involves only purchase order NY–668001 and a series of supplements that followed it. Thus any damages sustained by PP&L by reason of any default by GE with respect to other components will have to be addressed in later motions or at trial. GE has properly interposed its most significant motion first.

2a. Supplement 16 was drafted as a series of amendments to the Ebasco Purchase Order and Supplementary Terms and Conditions which Ebasco had issued on July 21, 1964.

3. Ebasco, Foster Wheeler and Combustion participated in the hearing only as observers and filed no briefs on the present motion.

Cir. 1961).[4] The remaining questions require that we determine whether genuine issues of material fact exist, thus precluding the grant of partial summary judgment on those matters. The parties have dwelled longest on the proper construction of the language of limitation in Supplement 16, though that problem causes us the least difficulty. Notwithstanding the able, often ingenious arguments of PP&L, we are satisfied beyond peradventure that the language of Supplement 16 excludes claims for replacement power, lost profits, and breach of implied warranties. Indeed, although there are other clauses from which an argument contra can be constructed, we find it difficult to conceive how the contract—and particularly Supplement 16—could have more clearly excluded these claims. However, partial summary judgment in GE's favor does not automatically follow, for we believe that there is a genuine issue of material fact: (1) on the question of whether PP&L obtained contract right pursuant to U.C.C. § 2–207 by virtue of the GE quotation, the PP&L purchase order and subsequent events; and (2) as to whether Ebasco possessed the authority to impair any such rights that may have existed, i. e., as to whether PP&L is bound by Supplement 16. Accordingly, with respect to PP&L's contractual claims against GE on NY–668001, partial summary judgment must be denied.

The remaining issue is tortious interference. On that point, we conclude that there exists a genuine issue of material fact on PP&L's tortious interference claim and on GE's defense of privilege thereto. This means that GE's motion for partial summary judgment as to the tortious interference claim must also be denied.

However, on the record as it now stands, there appears a question as to PP&L's ability to prove at trial that a § 2–207 contract was ever created or that Ebasco lacked authority to negotiate Supplement 16. And if a fact finder were to determine either that a § 2–207 contract was never formed or that Ebasco possessed the requisite authority to execute Supplement 16, we would, because of our construction of that Supplement enter judgment for GE on all claims for cost of replacement power, lost profits and any other damage arising from breach of implied warranty. Moreover, much of the evidence which will bear upon the existence of a § 2–207 contract and Ebasco's authority to execute Supplement 16 would also be relevant to determination of that facet of PP&L's counterclaim which seeks to recover cost of replacement power as a function of GE's alleged interference with the contractual and/or fiduciary relationship between PP&L and Ebasco.[5] Many of the individuals who would testify on such issues would also be wit-

---

4. The parties have stipulated that the law of Pennsylvania and New York is the same on all contract issues. Thus, we will cite cases from both jurisdictions and refer to the Uniform Commercial Code by that generic title. *See* Record of Oral Argument, January 7, 1975, at 41. We note that the Purchase Order provides that it is to be governed by the law of New York.

However, a substantial portion of Section III of this opinion discusses §§ 8A and 161 of the *Restatement (Second) of Agency*. Though these sections are clearly law in Pennsylvania, their status in New York is not as definite. See n. 41 *infra* and accompanying text. Because the parties have not had the opportunity to brief this question, we leave open whether §§ 8A and 161 are the law in New York, and if not, the resulting choice of

law determination. The parties may submit further briefs on this matter prior to trial.

Both parties have treated Pennsylvania law as applicable in deciding the tortious interference with contract claims. We will, therefore, cite cases taken primarily from that jurisdiction in our discussion of that count. We note that the essential elements of the tort seem to be the same in both jurisdictions. *Compare Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), *with Lamb v. S. Cheney & Son*, 227 N.Y. 418, 125 N.E. 817 (1920).

5. The PP&L counterclaim joining GE as an additional defendant asserts four causes of action against that corporation. Count I alleges that the services and equipment furnished by GE pursuant to its contracts with

nesses with respect to such factual issues as may survive the partial summary judgment motions of Foster-Wheeler and Combustion Engineering and the second partial summary judgment motion of GE, all of which are presently pending before us and which constitute the next order of business in this case.

In view of the enormous complexity of this litigation,[5a] and the significant extent to which total trial time might be reduced if the § 2-207 or authority issues are resolved in favor of GE, we have considered exercising the broad litigation management powers accorded to us to by Federal Rule of Civil Procedure 16 and scheduling an early trial on those issues and such other issues as may be closely related thereto: i. e., the tortious interference claim, and perhaps all of the contractual (as opposed to technical) issues in the case. We will hear from counsel at a special pretrial conference to be held on September 8, 1975, at 10:30 a. m. to discuss this subject. We turn now to a more detailed explication of the issues.

II. *Is the Language of Limitation Contained in Supplement [16] Sufficient to Insulate GE from PP&L's Claims for Cost of Replacement Power and Lost Profits, and from Claims Predicated Upon Breach of Implied Warranty?*

■ As noted in our Preliminary Statement, Supplement 16 was the product of several years of negotiations between representatives of Ebasco and GE. Those negotiations were intended,

apparently, to resolve the differences between the Ebasco and GE standard contract terms. The relevant language as finally agreed upon was set forth in Supplement 16, which provided for amendment of the Ebasco Supplementary Terms and Conditions in the following manner:

1) Article 16 of the Supplementary Terms and Conditions was deleted and replaced with the following language:

The Seller warrants to the Purchaser and the Owner that the Equipment to be delivered hereunder will be free from defects in material, workmanship and title and will meet the specifications contained in the contract. *The foregoing warranty is exclusive and in lieu of all other warranties whether written, oral or implied, including any warranty of merchantability or fitness for purpose.*

This warranty for each item of Equipment shall be for one (1) year after the initial date of synchronization of the units into the system. The conditions of any tests shall be mutually agreed upon, and the Seller shall be notified of, and may be represented at all tests that may be made.

If the Equipment delivered hereunder does not meet the warranty specified above, assuming normal and proper use and maintenance, the Purchaser or the owner shall notify the Seller and make the Equipment available promptly for correction. The Seller shall thereupon correct any defect, including non-conformance with the specifications, at its expense, either, at

Ebasco were defective. Count II alleges negligence on the part of GE in the design of and supervision of installation of equipment proffered pursuant to the contracts involved. Count III alleges a breach by GE of an implied warranty of witness for an intended purpose. Count IV alleges tortious interference by GE with the contract rights of PP&L vis-a-vis Ebasco. All four counts allege damages to PP&L including cost of replacement power incurred while the equipment malfunctioned. Although GE's motion for summary judgment does not specifically include a request for judgment on Count I of the PP&L counterclaim,

we were informed at oral argument by counsel for GE that the purpose of the motion was to preclude a claim for replacement power arising under *any count* of the counterclaim. Counsel for PP&L conceded that he would not be disadvantaged by the late notice. Accordingly, we have treated the GE motion as one to bar PP&L from pursuing any claim for replacement power arising under any count of the counterclaim.

5a. The parties agree that the technical aspects of the case could take many months to try.

its option, by repairing or replacing any defective or damaged parts of the Equipment.

The liability of the Seller to the Purchaser or the Owner under this warranty (except as to title) or for any loss or damage to the equipment whether the claim is based on contract or negligence shall not in any case exceed the cost of correcting defective or damaged parts as herein provided, and upon the expiration of said one year all such liability shall terminate. The foregoing shall constitute the exclusive remedy of the Purchaser and the sole liability of the Seller. (emphasis added).

2) A new paragraph entitled "Limitation of Liability" was added to the contract reading:

Except as provided in the patent indemnity provision the Seller's liability on any claim of any kind, including negligence, for any loss or damage arising out of, connected with, or resulting from this contract, or from the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or technical direction of installation, startup or inspection repair operation or use of any equipment covered by or furnished under this contract shall in no case exceed the contract price of the turbine-generator unit or boiler feed pump turbine which gives rise to the claim and shall terminate six (6) years after the initial date of synchronization of the unit into the system. *In no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall the Seller be liable for damages for loss of profits or revenue resulting therefrom, or for damages for loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for severe interruptions resulting therefrom, or similar items of damage resulting therefrom.* (emphasis added).

Regardless of whether replacement power be termed a general or special damage[6], U.C.C. § 2–719(1)(a) and (3) are quite clear in permitting GE to limit its liability in this manner.[7]

PP&L argues that the language of Supplement 16 is not specific enough to absolve GE from liability for its own negligence. In particular, PP&L relies on those cases holding that though parties are permitted to contractually abrogate liability for negligent conduct, it must be done in clear and unequivocal language.[8] We agree with PP&L that

---

6. That distinction is not a clear one and would turn on what damages were contemplated by the parties at the time the contract was entered. *See, e. g., Kaufman v. Gordon,* 24 Misc.2d 240, 197 N.Y.S.2d 1013, 1020 (1960), *aff'd.,* 10 N.Y.2d 769, 219 N.Y.S.2d 614, 177 N.E.2d 54 (1961); *cf. Kerr S.S. Co. v. Radio Corp. of America,* 245 N.Y. 284, 157 N.E. 140 (1927). That is, of course, a question of fact about which there is substantial dispute, and which we might not be able to decide on a motion for summary judgment. However, the point is moot because, as noted in the text, the Code is explicit in allowing limitation of liability for either general or special damages.

7. Cases so holding and applying Pennsylvania law include *Wyatt Ind., Inc. v. Publicker Ind., Inc.,* 420 F.2d 454 (5th Cir. 1969) (precluding recovery of general damages); *K & C, Inc. v. Westinghouse Elec. Corp.,* 437 Pa. 303, 263 A.2d 390 (1970) (consequential damages). *Potomac Elec. Power Co. v. West-*

*inghouse Elec. Corp.,* 385 F.Supp. 572 (D.D.C.1974), arose from the sale of a similar turbine under contract language substantially the same as that of Supplement 16. Though Judge Parker applied Maryland law in upholding the limitation of liability clause, we note that the relevant portions of the Pennsylvania and Maryland Codes are identical. We find Judge Parker's reasoning persuasive and elect to follow it on this point. *See also Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 616–17 (7th Cir. 1975).

Although PP&L claims that GE took advantage of a superior negotiating position to induce Ebasco to breach its contract with PP&L, see discussion *infra,* there is no claim that the provisions of Supplement 16 were unconscionable. *Cf.* U.C.C. § 2–302.

8. *See, e. g., Howard v. Handler Bros. & Winell,* 279 App.Div. 72, 75–76, 107 N.Y.S.2d 749, 752 (1951) aff'd. 303 N.Y. 990, 106 N.E.2d 67 (1952); *Employers Liab. Assur. Corp. v. Greenville Business Men's Ass'n,*

the law requires such exculpatory clauses to be precisely worded. But we find it difficult to imagine a clause much clearer than the one involved here: "in no event, . . . as a result of . . . alleged negligence . . . shall the Seller be liable for damages for loss of profits . . . [or] cost of purchased or replacement power . . ." We thus think it plain that the language of the Limitation of Liability clause precludes any recovery for cost of replacement power or lost profits.[9] The case principally relied upon by PP&L, *Willard Van Dyke Prod., Inc. v. Eastman Kodak Co.,* 12 N.Y.2d 301, 239 N.Y. S.2d 337, 189 N.E.2d 693 (1963), is readily distinguishable. In *Willard* the clause relied upon by defendant to insulate it from liability made no mention of the word "negligence" at all. A clause not even using the word "negligence" cannot be equated with the language used here.[10]

Despite the clear language of Supplement 16, PP&L advances a number of further arguments that the limitation of liability clause does not preclude liability for cost of replacement power or breach of implied warranty.

PP&L's first additional argument springs from two venerable canons of contractual interpretation. We quarrel with neither canon and state them as follows:

a) Any ambiguity in the terms of an agreement should be construed against the party which drafted the language. *Rentways, Inc. v. O'Neill Milk & Cream*

*Co.,* 308 N.Y. 342, 126 N.E.2d 271 (1955); and

b) Where a party seeks to avoid liability for damages otherwise attributable to him, the contractual language implementing such purpose must be clear and precise. *Willard Van Dyke Productions, Inc. v. Eastman Kodak Co.,* 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963).

 From this starting point, PP&L attacks the "limitation of liability" clause and, more particularly, the last sentence thereof wherein GE has sought to exclude all possible claims for cost of replacement power. As noted earlier, that sentence provides:

In no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall the Seller be liable for damages for loss of profits or revenue resulting therefrom, or for damages for loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of Purchaser for severe interruptions resulting therefrom, or similar items of damage resulting therefrom.

PP&L correctly observes that the term "purchaser" as used in the above provision is defined in Article 1 of the Supplementary Terms and Conditions and refers solely to Ebasco. Article 1 also provides that the term "owner" shall be used in the agreement if reference to PP&L is intended. Accordingly, PP&L contends, because the "limitation of liability" clause refers to "purchaser" and

---

423 Pa. 288, 224 A.2d 620 (1966); *Neville Chem. Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir. 1970); *cf. Keystone Aero. Corp. v. R. J. Enstrom Corp.,* 499 F.2d 146 (3d Cir. 1974).

9. As noted in the preliminary statement, the language of Supplement 16 limits liability for cost of replacement power only if we determine that Supplement 16 became part of the contract, binding upon PP&L, when Ebasco executed it in 1967.

10. We also note that the factual situation in *Willard* differs substantially from the one

before us. *Willard* involved the purchase by a commercial movie maker of pre-packaged film from a Kodak retailer. The package was pre-printed with the disclaimer upon which Kodak sought to rely and plaintiff thus obtained it in a "take it or leave it situation." Though not essentially a consumer protection case, that situation is a far cry from the hard bargaining involved here. *Cf. Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 616–17 (7th Cir. 1975).

not to "owner", it is intended to limit the remedies of Ebasco and not PP&L. Alternatively, PP&L would seek our declaration that at the very least, this confusion of antecedents renders the clause ambiguous and thus requires us to construe it against the party seeking to limit liability, herein GE.

We find these arguments unpersuasive; indeed, we find the relevant terms remarkably unambiguous. When reduced to essentials they provide that "in no event . . . shall the Seller be liable for damages for . . . cost of purchased or replacement power . . ."[11] As GE correctly argues, the clause precludes all claims for cost of replacement power regardless of the identity of the claimant. The use of "purchaser" in the provision is restricted to the clause relating to claims of customers for severe service interruptions, an item of damages unrelated to this litigation.

PP&L makes a related argument along the following lines: 1) the "guarantee" provision of Supplement 16, in which GE grants several limited warranties and abjures all others, provides that the foregoing "shall constitute the exclusive remedy of the Purchaser and the sole liability of the Seller"; 2) the Supplemental Terms and Conditions define "Purchaser" to mean Ebasco and "Seller" to mean GE; 3) limitations of liability must be clearly expressed and any ambiguity must be construed against the party seeking to avoid lia-

bility; and therefore, 4) the exclusion of implied warranties provided for in the "guarantee" provisions of Supplement 16 is not binding upon PP&L.

■■ We reject this argument. As GE has correctly noted, paragraph 18 of the Supplementary Terms and Conditions provides that "all warranties and guarantees to the Purchaser shall inure to and be for the benefit of the Owner with the same force and effect as if the Owner had been a party hereto." We think that this provision effectively disposes of PP&L's contention in this regard. Moreover, the "limitation of liability" provision of Supplement 16 effectively precludes any claim by PP&L for cost of replacement power even were such a claim predicated upon breach of implied warranty grounds.[12]

PP&L also contends that the language of Supplement 16 does not insulate GE because the language is inconsistent with the terms of the original purchase order. Article 1 of the Supplementary Terms and Conditions to the December 1967 contract documents provides that where the Supplementary Terms and Conditions conflict with the purchase order, the latter shall prevail; hence, PP&L would hold GE to the "guarantees" contained in that document. However, we think this argument no more than a restatement of the contention that Ebasco was unauthorized to amend the terms of the original purchase order and negotiate supplementary terms; this

11. Paragraph 1 of the Supplementary Terms and Conditions also identifies "Seller" as the party supplying the equipment, in this instance GE.

12. PP&L apparently concedes that the U.C.C. permits GE to exclude implied warranties of merchantability and fitness for particular purpose and any liability resulting therefrom. U.C.C. § 2-316(2) and (4). We have no difficulty in concluding that the exclusion of implied warranties of merchantability and fitness for particular purpose was adequately effected by the "guarantee" clause providing:

The Seller warrants to the Purchaser and the Owner that the Equipment to be delivered hereunder will be free from defects in material, workmanship and title and

will meet the specifications contained in the contract. The foregoing warranty is exclusive and in lieu of all other warranties whether written, oral or implied, including any warranty of merchantability or fitness for purpose.

See, e. g., Potomac Elec. Power Co. v. Westinghouse Elec. Corp., 385 F.Supp. 572, 574–75 (D.D.C.1974); Smith v. Reynolds Metals Co., 323 F.Supp. 196 (M.D.Pa.1971); Southwest Forest Ind., Inc. v. Westinghouse Elec. Corp., 422 F.2d 1013 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); Bakal v. Burroughs Corp., 74 Misc. 2d 202, 343 N.Y.S.2d 541 (S.Ct., Schenectady Co., 1972).

contenton will be discussed separately, *infra.* Certainly, if Ebasco was so authorized, paragraph 2 of the Supplementary Terms and Conditions indicates that the proper means of amending the purchase order was by the use of a Supplement.[13]

■ A further PP&L argument springs from a provision contained in Supplement 16 which amended the portions of the purchase order captioned "Superintendence of Erection" by substituting therefor new language entitled "Technical Direction of Installation" (T.D.I.). The final paragraph of the T.D.I. clause provides:

> The Seller agrees to indemnify and hold Purchaser and Owner harmless from and against all loss, damage and expense occasioned by any negligent act or negligent omission of any failure (sic) of its Field Representative to exercise due care in the performance of any of the obligations specified herein to be performed by the Seller. The foregoing indemnity shall not apply to any loss or injury to persons or property caused (a) by negligent acts or negligent omissions of the Purchaser, its employees, agents or sub-contractors, (b) by failure of the Purchaser, its employees, agents or subcontractors to exercise due care in following the Field Representative's instructions, or (c) by failure or malfunctioning of any tools, equipment facilities or devices furnished by the Purchaser, it employees, agents or subcontractors.

We find unpersuasive PP&L's contention that the indemnification contained in the T.D.I. clause by which GE accepted liability for all "loss, damage and expense" resulting from negligent performance of those duties is sufficient to impose upon GE liability for cost of replacement power. PP&L contends that because the T.D.I. amends a portion of the original purchase order, it becomes part and parcel of the original purchase order, and therefore prevails, pursuant to Article I of the Supplementary Terms and Conditions over any other term in the Supplementary Terms and Conditions. The difficulty with accepting such an argument is that to do so would emasculate the entire limitation of liability paragraph. Clearly, that clause was inserted by the parties to preclude liability on the part of GE for the cost of replacement power regardless of the source of such a claim. To now hold that clause "conflicts" with the T.D.I. would negate the very existence of the limitation of liability provision because the latter clause is—by definition—in "conflict" with any other contract clause prescribing a measure of liability. We decline to so hold.

■ PP&L's next argument stems from Paragraph 17 of the Ebasco Supplementary Terms and Conditions which provides:

17. DELAY

The Seller shall be held responsible for any damages of a general nature which the Purchaser and/or the Owner may incur due to any delay in delivery or in the completion of the work hereunder as a result of causes within the Seller's reasonable control and shall be held responsible only for such special damages as are specifically and clearly referred to in the Order. In the event of any delay due to causes beyond the Seller's reasonable control, such as acts of God, acts of the

---

13. Paragraph 2 of the Supplementary Terms and Conditions provides:
 Any revisions and amendments to the Order shall be effected by a supplement to the Order, which supplement shall be furnished to the Seller.
As we have noted, the question of Ebasco's authority must be determined at trial. However, we add that page 7 of the Purchase Order provides that the Supplementary Terms and Conditions are to be deemed part of the contract; hence, we would not hesitate to accept the far more specific provisions contained in the Supplemental Terms and Conditions as expressing the intent of the parties on the issues of limitation of liability and warranty.

Purchaser and/or the Owner, acts of civil or military authority, priorities, fires, strikes, floods, epidemics, quarantine restrictions, war, riot, delays in transportation, car shortages, and inability due to causes beyond its reasonable control to obtain necessary labor, materials, or manufacturing facilities, the date of delivery shall be extended for a period equal to the time lost by reason of the delay.

The argument proceeds from the notion that because Supplement 16 did not expressly amend Paragraph 17 of the Supplementary Terms and Conditions, GE accepted the terms of Paragraph 17 and agreed to be responsible for general damages caused by any delay in performance of its contractual obligations. Because general damages include all damages reasonably foreseeable at the time of contracting, and because the record allegedly establishes that all parties foresaw the cost of replacement power as an item of damage, PP&L asserts that the presence of the delay provision requires us to deny GE's motion for summary judgment. We disagree. Again we are faced with the clear and unambiguous language of the limitation of liability provision of Supplement 16 which provides that "[i]n no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall the Seller be liable for . . . cost of purchased or replacement power . . . ." It seems clear to us that

delay is no more than a species of breach of contract as that phrase is used in the limitation of liability clause. At the very least, delay is an "otherwise". Just as with the language in the T.D.I., discussed *supra,* to hold otherwise would be to negate the entire thrust of the limitation of liability clause.[14]

Lastly, PP&L contends that, because GE supplied other components for the Brunner Island project under four separate contracts containing dissimilar remedy and warranty provisions, we should hesitate to grant summary judgment on the GE motion presently before us. We reject this approach. GE is not *now* seeking to avoid liability on any of the other contracts pursuant to which it provided equipment at Brunner Island.[15] On the other hand, the question whether GE may be held liable for the cost of replacement power purchased because of defects in any of the equipment provided by it under Purchase Order NY–668001, is squarely before us. We do not think that possible liability on wholly separate contracts is a reason to deny summary judgment on this one.

In sum, we believe that the language of Supplement 16, if properly a part of the contract, is sufficient to preclude recovery by PP&L from GE of cost of replacement power and of damages flowing from any breach of implied warranty under any theory bottomed upon the contract between the parties. However, our inquiry is in this regard not

14. Because the DELAY provision makes Seller liable only for general damages or special damages specifically referred to in the purchase order, and because cost of replacement power is not mentioned as a special damage in the purchase order, the parties have extensively briefed the question of whether cost of replacement power is a general or special damage. In light of our determination that the limitation of liability clause in Supplement 16 bars any recovery of cost of replacement power whether as a general or special damage, we need not reach this problem. Were the question before us, we doubt the propriety of resolving it on a motion for summary judgment in light of the essentially factual determination that

must be made as to the damages foreseen by the parties at the time of contracting. *See, e. g., Spang Ind., Inc. v. Aetna Cas. & Sur. Co.,* 512 F.2d 365, (2d Cir. 1975). *Cf. Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903); *New York Water Service Corp. v. City of New York,* 4 A.D.2d 209, 163 N.Y.S.2d 538 (1957).

15. GE has filed a second motion for partial summary judgment seeking to avoid liability on contract #NY–668008 and the equipment furnished pursuant thereto. PP&L has responded and the matter is awaiting argument at this time.

concluded, for we must still determine whether genuine issues of material fact exist on the question of whether Supplement 16 is properly a part of the contract in question. We discuss this matter in the ensuing section of this opinion.

III. *Is There a Genuine Issue of Material Fact on the Question Whether PP&L Obtained Contractual Rights Pursuant to § 2–207 of the Uniform Commercial Code, by Virtue of the GE Quotation of July 15, 1964, the PP&L Purchase Order of July 21, 1964 and the Events Occurring Thereafter but Prior to December 7, 1967, the Date Upon Which Supplement 16 was Executed; if PP&L Obtained Contractual Rights Pursuant to § 2–207, did Ebasco Have Authority to Impair These Rights? Is PP&L Bound by Supplement 16?*

A. *Introduction*

The second major contention that PP&L advances in opposition to GE's motion for summary judgment revolves around § 2–207 of the Uniform Commercial Code (U.C.C.). That section reads as follows:

> (1) A definite and seasonable expression of acceptance or written confirmation which is sent within a reasonable time operates as an acceptance even though is states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (a) the offer expressly limits acceptance to the terms of the offer;

> (b) they materially alter it; or

> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Succinctly stated, PP&L's threshold contention is that we may not award summary judgment on the "contract" until it is determined just what documents and acts define the contract. PP&L's interpretation of what constitutes the contract may best be summarized by quoting the relevant portion of its brief:

> PP&L contends that a legally enforceable agreement containing the Ebasco Supplementary Terms and Conditions existed before December 7, 1967. On July 15, 1964, GE issued a quotation for a turbine generator subject to the GE Handbook terms and conditions. Ebasco accepted the GE price by letter dated July 21, 1964 and stated that "[a] formal contract will be issued at a later date containing the terms and conditions of, and in the format of, the usual type of contract issued by Ebasco." Although GE internal documents indicate that GE recognized that the Ebasco terms and conditions were different than the terms and conditions of the GE Handbook, GE never communicated its rejection of the Ebasco terms in connection with the turbine generator agreement until years later, May 4, 1967. That Ebasco had assumed that the usual form of Ebasco contract would govern the turbine generator agreement is clear from Ebasco's very

strong response on May 25, 1967.[16] Ebasco's position was supported not only by GE's silence on the subject but also by the fact that GE had accepted the Ebasco terms in four other contracts executed in connection with Brunner No. 3 as well as in contracts for other projects.

PP&L contends then, that in determining what contractual provisions apply to the current dispute, we should look not to Supplement 16, but rather to the contract allegedly formed in 1964 between the parties by operation of law pursuant to U.C.C. § 2–207. But the argument does not stop here, for if it did, it would not prove enough. Linked to the foregoing is the contention that because a contract was formed pursuant to § 2–207 at the time of the quotation-purchase order exchange, and because that contract, according to § 2–207, contained warranties and remedies superior to those provided in Supplement 16, Ebasco was, as agent for PP&L, duty bound to advance its interests and without power to impair them by entering into Supplement 16 on behalf of PP&L.[17] The "bottom line" to this argument is that Supplement 16 never became binding on PP&L and that the limitation of liability and disclaimers of implied warranty clauses contained therein do not govern this transaction. However, as noted, we must first determine whether there is a genuine issue of material fact on the question of whether PP&L obtained contract rights pursuant to § 2–207. GE contends that there is no such genuine issue of fact and that we must

declare as a matter of law that no § 2–207 contract was formed.

Perhaps the strongest formulation of the position that PP&L did in fact obtain contract rights pursuant to § 2–207 was made by Mr. Conrad, counsel for PP&L, at hearing on this motion:

I ask Your Honor fairly if Salerno, [A. J. Salerno, Ebasco Purchasing Agent], had said the heck with GE, the heck with the consequences, we are not going to sign Supplement 16, would any Court not require GE to deliver that turbine generator? Couldn't Ebasco get damages under these circumstances, particularly where GE has already made deliveries? The two boiler feed-pump turbines were delivered before Supplement 16 was ever negotiated or signed and after Salerno protested that Ebasco's terms and conditions governed. Now, what could be solider than that, Your Honor, under the Uniform Commercial Code?

Transcript of Oral Argument 79–80.

Though the question is not before us, PP&L makes an enormously powerful argument that GE would not have been allowed to back out of the deal at that late point in time. But, unfortunately, even a conclusion that PP&L is correct on that point would not resolve the matter. For as Professors White and Summers put it:

Unfortunately [2–207] is in one respect like the amphibious tank that was originally designed to fight in the swamps, but was ultimately sent

---

16. The reference is to a letter from A. J. Salerno, Ebasco Purchasing Agent to R. B. Davis, Sales Engineer at General Electric. In relevant part that letter stated:

We wish to acknowledge receipt of your letter, dated May 4, 1967, conveying your comments with respect to the wording of the subject contract document.

In declining to accept the modifications proposed in your letter, we refer to our letter dated July 21, 1964 wherein it is stated that the formal contract would be issued containing the terms and conditions of the usual type of contract issued by Ebasco.

At that time your verbal comments concerning the commitment were recorded in our supplementary letter of October 1, 1964 which, together with our letter of September 16, 1964 adding boiler feed pump turbines and the original July 21, 1964 formed the basis of the commitment. [sic]

There was no doubt in our minds as we're sure there was none in yours at the time of commitment as to the basis on which the commitment was made.

17. See discussion accompanying notes 36–49, *infra*.

to fight in the desert. The original draftsman of 2–207 designed it to keep the welsher in the contract . . [It] was initially designed primarily to change the result in [cases in which the courts had allowed welshers to escape their contractual ties because of the lack of a so-called mirror image acceptance on the part of the offeree]. It rejects the common law mirror image rule and converts the common law counteroffer into an acceptance under 2–207(1).

But unfortunately the courts have had to press 2–207 into service not just to hold the welsher in. Parties to sales deals much more often call on courts to use 2–207 to decide the terms of their contract after they exchange documents, perform, or start to perform and then fall into dispute. This is not only a different but also a more difficult problem for the law than that of keeping the welsher in. The law as to terms must be sophisticated enough to nullify the efforts of fine-print lawyers, it must be sufficiently reliance-oriented to protect the legitimate expectations of the parties, and it must be fair and even handed. It must not give one side the whole loaf, especially on nonnegotiated matters.

J. White & R. Summers, Uniform Commercial Code §§ 1–2, at 24–25 (1972). As will be seen, we cannot conclude as a matter of law, that a § 2–207 contract existed, or that one did not. We will outline some of the issues of material fact which we believe exist and which preclude our determining upon a motion for summary judgment the questions of whether a § 2–207 contract ever existed and, if so, the terms thereof.

We begin by noting that § 2–207 provides for two quite different means for creation of a contract. The first is by the writings of the parties pursuant to § 2–207(1) and (2). Additionally, where the writings of the parties do not otherwise create one, § 2–207(3) provides for creation of a contract by conduct.

Subsections 2–207(1) and (2) are, perhaps, less than adequately drafted.[18] As a result, the cases construing them have not always been in accord. One of the earliest cases and perhaps the most celebrated to deal with § 2–207 is *Roto-Lith, Ltd. v. F. P. Bartlett & Co.,* 297 F.2d 497 (1st Cir. 1962), a suit by plaintiff for breach of an implied warranty of fitness. The plaintiff had ordered from defendant an emulsion for use in the plaintiff's manufacturing process by means of a purchase order stating, *inter alia,* "End use: wet pack spinach bags". It was from this language that plaintiff argued that defendant was aware of the particular purpose for which he needed the emulsion. The sale was consummated, however, by defendant's acknowledgement containing provisions expressly excluding any guarantees or warranties and stating that "[i]f these terms are not acceptable Buyer must notify Seller at once". Plaintiff did not contest the terms, paid for the emulsion, used it, and found it defective. Plaintiff's initial contention, with which the First Circuit agreed, was that defendant's condition that there be no warranties constituted a proposal which "materially altered" the agreement. Plaintiff further contended that the acknowledgement effected a completed agreement without the dis-

---

18. *See, e. g., Dorton v. Collins & Aikman Corporation,* 453 F.2d 1161, 1165 (6th Cir. 1972):

This section of the UCC has been described as a "murky bit of prose," *Southwest Engineering Co. v. Martin Tractor Co.,* 205 Kan. 684, 694, 473 P.2d 18, 25 (1970), as "not too happily drafted," *Roto-Lith Ltd. v. F. P. Bartlett & Co.,* 297 F.2d 497, 500 (1st

Cir. 1962), and as "one of the most important, subtle, and difficult in the entire Code, and well it may be said that the product as it finally reads is not altogether satisfactory." Duesenberg & King, Sales and Bulk Transfers under the Uniform Commercial Code, (Vol. 3, Bender's Uniform Commercial Code Service) § 3.03, at 3–12 (1969).

claimer because as a further proposal which materially altered the original offer, the disclaimer could not become part of the agreement unless plaintiff expressed assent thereto. This latter contention was rejected by the Court. Judge Aldrich, speaking for the Court, wrote:

> We agree that Section 2–207 changed the existing law, but not to this extent. Its purpose was to modify the strict principle that a response not precisely in accordance with the offer was a rejection and a counteroffer. . . . Now, within stated limits, a response that does not in all respects correspond with the offer constitutes an acceptance of the offer, and a counteroffer only as to the differences. If plaintiff's contention is correct that a reply to an offer stating additional conditions unilaterally burdensome upon the offeror is a binding acceptance of the original offer plus simply a proposal for the additional conditions, the statute would lead to an absurdity. Obviously no offeror will subsequently assent to such conditions.
>
> . . . . . .
>
> Perhaps it would be wiser in all cases for an offeree to say in so many words, "I will not accept your offer until you assent to the following: * * *" But businessmen cannot be expected to act by rubric. It would be unrealistic to suppose that when an offeree replies setting out conditions that would be burdensome only to the offeror he intended to make an unconditional acceptance of the original offer, leaving it simply to the offeror's good nature whether he would assume the additional restrictions. To give the statute a practical construction we must hold that a response which states a condition materially al-

tering the obligation solely to the disadvantage of the offeror is an "acceptance * * * expressly * * * conditional on assent to the additional * * * terms."

297 F.2d at 500 (citations omitted).

The *Roto-Lith* Court thus *implied* a condition of acceptance, instead of hewing strictly to the requirement of § 2–207(1) that conditional acceptance must be expressed in words.[19] Although there is much to be said for the *Roto-Lith* approach, the case has not been treated kindly by the cases or commentators.[20] Instead, most courts have adopted a construction of § 2–207(1) typified by that of the Sixth Circuit and outlined in *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161 (6th Cir. 1972).

In *Dorton*, a carpet retailer sued its supplier alleging that carpet purchased from the supplier was not woven from the agreed upon fiber. Defendant sought a stay of the Federal Court action pending compulsory arbitration, which it claimed was mandated by language included in its acknowledgement of sale form. That acknowledgement was sent upon receipt of an oral order from plaintiff and included the following language:

> [t]he acceptance of your order is subject to all of the terms and conditions on the face and reverse side hereof, including arbitration . . . .

453 F.2d at 1164. Assuming that the addition of a clause requiring arbitration would have effected a material change in the offer, (actually the Sixth Circuit remanded to the District Court for a finding on this question), the *Dorton* Court held that despite the conditional language contained in the acknowledgement, that language was not sufficient to make the acceptance "con-

---

19. The Court, noting that plaintiff had accepted the goods with knowledge of the conditions specified in the acknowledgement proceeded to a second holding: that plaintiff (buyer) became bound by the acknowledgement, and thus affirmed judgment for the seller.

20. *See, e. g.*, Notes and Comments at 111 U. Pa.L.Rev. 132 (1962); 57 Nw.U.L.Rev. 477 (1962); 76 Harv.L.Rev. 1481 (1963); 38 U.Chi.L.Rev. 540 (1963).

ditional upon assent to the different terms":

> Viewing the Subsection (1) proviso within the context of the rest of that Subsection and within the policies of Section 2–207 itself, we believe that it was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein.

453 F.2d 1161, 1168 (6th Cir. 1972). In contrast to the *Roto-Lith* approach, where the notion of acceptance expressly conditional on assent to additional terms is implied, the *Dorton* approach is to recognize a contract unless the would-be acceptance specifically makes its operation conditional on the offeror's *assent* to its terms. Concluded the Court:

> To recognize Collins & Aikman's acceptances as "expressly conditional on [the buyer's] assent to the additional . . . terms" therein, within the proviso of Subsection 2–207(1), would thus require us to ignore the specific language of that provision. Such an interpretation is not justified in view of the fact that Subsection 2–207(1) is clearly designed to give legal recognition to many contracts where the variance between the offer and acceptance would have precluded such recognition at common law.

*Id.* (footnote omitted). Despite a certain appeal of *Roto-Lith,* we believe that the *Dorton* decision reflects the better approach (as well as the weight of authority).[21] That conclusion is relevant here because the *Roto-Lith* approach would bar the formation of a § 2–207(1)

contract if material differences exist in the GE quotation and Ebasco reply, whereas the *Dorton* approach leaves open the possibility that a contract was created pursuant to § 2–207(1) if certain factual issues were to be resolved by a fact finder in favor of PP&L.[22]

As noted previously, § 2–207(3) provides an additional ground for creation of a contract where "the writings of the parties do not otherwise establish [one]". Thus, where the conduct of the parties is consistent with the existence of a contract, a contract may be formed with terms consisting of those agreed upon in any of the writings of the parties, together with other terms provided in the Code. This subsection is also relevant here and will be discussed more fully below.[23]

Having outlined the provisions of § 2–207 and the gloss accorded it by way of judicial interpretation, we turn now to our reasons for concluding that there are genuine material issues of fact pertaining to all three subsections of § 2–207 which foreclose our establishing on a motion for summary judgment whether a § 2–207 contract ever existed.

### B. *Issues of Fact Under § 2–207(1)*

The determination of whether and when a contract first came into existence between GE and Ebasco (acting as agent for PP&L) is sufficiently factually complex to preclude a determination in a summary judgment proceeding of issues arising under § 2–207(1).

On July 15, 1964, by means of a letter from T. J. Barron of the GE Electric Sales Department, GE quoted to Ebasco a price for the steam turbine generator

---

21. Although Pennsylvania was the first state to enact the UCC (in 1954), we have found only two cases which interpret § 2–207 as part of Pennsylvania's law. One, *Just Born, Inc. v. Stein, Hall & Co.,* 59 Pa.D. & C.2d 407 (C.P., Northampton Co. 1971) specifically rejects *Roto-Lith's* construction of § 2–207 in a factual situation quite similar to that found in *Dorton.* The other, *Air Products and Chem., Inc. v. Fairbanks Morse, Inc.,* 58 Wis. 2d 193, 206 N.W. 414 (1973) (applying Penn-sylvania law), also found that the inclusion of a material alteration in the acceptance was not sufficient to bar creation of a contract, thus impliedly rejecting *Roto-Lith,* also.

22. See discussion, *infra,* n. 24–25 and accompanying text.

23. See discussion, *infra,* n. 33 and accompanying text.

involved in this case. Significantly, the letter commenced with this language: "Confirming Mr. George Cox's conversation of today, we are pleased to quote as follows. . . . " On July 21, 1964, Ebasco replied by means of a letter from A. J. Salerno, Ebasco's purchasing agent, which letter began "This will confirm the verbal commitment of our Mr. C. C. Bonin to your Mr. George Cox on July 15, 1964, for One (1) Turbine Generator Unit described as follows. . . . " These letters reflect that previous discussion concerning the turbine generator had resulted in an understanding between the parties which was communicated by telephone on July 15. If the understanding was in the nature of an informal agreement between the parties as to the terms of the purchase contract, then Official Comment 1 to U.C.C. § 2–207 would indicate that the section is applicable to these facts:

> This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal [acknowledgements or] memoranda embodying the terms so far as agreed upon and adding terms not discussed.
> . . .

In such a situation, it would be necessary for the fact finder to determine what terms were agreed upon in the informal agreement and then apply § 2–207(2) to construct the remaining provisions of the contract. Obviously the terms of any oral agreement that did exist are not subject to resolution on a motion for summary judgment upon the record before us.[24]

There is a second set of possibilities. A fact finder could conclude: (1) that the Ebasco reply letter of July 21, notwithstanding its reference to Ebasco's terms and conditions constituted a "definite and seasonable expression of acceptance" of GE's purchase order; and (2) that the Ebasco reply letter was not expressly made conditional on assent to the additional terms, thus bringing the letters within the ambit of and creating a contract under § 2–207(1).[25] On the other hand, we think a fact finder could also find that although the Ebasco reply letter was not expressly made conditional upon assent to the additional terms, nevertheless, the reply could not reasonably be construed as a "definite and seasonable expression of acceptance." In other words, although the language contained in the Ebasco reply of July 21 to the effect that the sale would be transacted pursuant to the Ebasco terms and conditions is not necessarily sufficient under § 2–207(1), as construed in *Dorton,* to create an "acceptance . . . expressly made conditional on assent to the additional . . . terms" (see n. 25, *supra*), we believe that the existence of the language also creates a question for the fact finder as to whether the letter could reasonably have been construed as a "definite and seasonable expression of acceptance." As the Court noted in *Construction Aggregates Corp. v. Hewitt-Robins, Inc.,* 404 F.2d 505, 509 (7th Cir. 1968):

> The resolution of [the] question "turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances," so that it [is] properly referable to [the fact finder].

24. *Cf. Dorton v. Collins & Aikman Corp., supra,* where the case was remanded for findings on this point.

25. In view of our rejection of the *Roto-Lith* approach, we are inclined to think that we may have to resolve this issue as a matter of law by concluding that the Ebasco reply letter was not made conditional upon the kind of assent that *Dorton* would require. However, this issue was never dwelt upon by GE in its briefs, hence, we are reluctant to so declare at this time. GE may be able to perceive factual issues on the point, and in view of our decision to deny GE's motion in any event, it is not necessary to finalize our view on the question at this time.

*Rankin v. Fidelity Insurance Trust & Safe Deposit Co.*, 189 U.S. 242, 252–53, 23 S.Ct. 553, 47 L.Ed. 792.[26]

If the fact finder concluded that the letter should not have been so construed, no contract would be formed pursuant to § 2–207(1) and what contract, if any, existed would be determined by reference to the common law and § 2–207(3). Thus, we cannot say as a matter of law that a contract was or was not created under § 2–207(1). That determination must await the decision of the fact finder on those matters presently left open in this record.

### C. *Issues of Fact Under § 2–207(2)*

Since it is possible that § 2–207 (1) would be found applicable to the correspondence between GE and Ebasco, it is appropriate to consider whether genuine issues of material fact exist relating to the application of § 2–207(2) in constructing the terms of the contract. That subsection deals with the effect to be accorded terms contained in the acceptance which are in addition to those terms contained in the offer or, perhaps, different therefrom,[27] where a contract has been formed pursuant to § 2–207(1). We will content ourselves here with indicating those areas in which we think genuine issues of material fact still exist. There is no dispute that on July 15, 1964, by means of a letter from T. J. Barron of the GE Electric Sales Department, GE quoted to Ebasco a price for the steam turbine generator involved in this case. The letter set forth various pricing data, and a provision providing Ebasco with an option to cancel within 90 days. It then continued:

> The above prices are based on our Standard Conditions of Sale, Price Policy, and Price Data as shown in GE Handbook Section 4710, dated May 25, 1964.

Also undisputed, is the reply letter from A. J. Salerno, the Ebasco purchasing agent, dated July 21, 1964, which, after restating the turbine specifications, concluded:

> A formal contract will be issued at a later date containing the terms and conditions of, and in the format of, the usual type of contract issued by Ebasco.

However, the facts in the ensuing phases of the parties' dealings are not undisputed, and it would be for a fact finder to determine, pursuant to § 2–207(2) what terms were included in the contract allegedly created by the exchange of letters in July of 1964.

For instance, § 2–207(2) provides that additional terms become a part of the contract unless *inter alia* "notification of objection to them has already been given or is given within a reasonable time after notice of them is received." A genuine material issue of fact exists as

---

**26.** The Court in *Construction Aggregates* faced a factual complex not dissimilar from that confronting us. Construction Aggregates (CAC) was the successful bidder on a contract for the construction of dikes enclosing approximately 60 square miles of the Dead Sea. A large conveyor system was needed for the job and construction of the system was sub-contracted to Hewitt-Robins Corp. (HR). The sub-contracting arrangement was agreed upon following a series of negotiations and exchanges of letters. The exchanges culminated with a July 3, 1962 purchase order from CAC to HR and a July 20, 1962 response from HR predicating acceptance on certain modifications including a limitation of liability clause. The Court ruled that the question of whether letters exchanged prior to June 30 had created a contract was for the jury to decide and that the language of the July 20 reply was sufficient to advise CAC that acceptance was conditional on assent to it.

**27.** Although the express language of § 2–207 (2) refers only to additional terms, both Comment 3 to the section and several commentators urge that the subsection is appropriately applied to subjects treated differently in the offer and acceptance. Official Comment 3 states:

> Whether or not additional *or different* terms will become part of the agreement depends upon the provisions of subsection (2). . . . (emphasis added).

*See, e. g.,* 32 U.Pitt.L.Rev. 209, 210 (1971). *But see, American Parts Co., Inc. v. American Arb. Ass'n*, 8 Mich.App. 156, 154 N.W.2d 5 (1967).

to whether and/or when GE gave notice to Ebasco of GE's objection to the terms of the Ebasco standard agreement. The record currently reflects at least three different occasions upon which a fact finder could find that Ebasco had been notified of GE's objections. The first such occasion might well be upon receipt by Ebasco of the July 14, 1964, letter and quotation. At that point Ebasco was aware of the fact that the terms upon which GE proposed to conduct the sale differed from the standard Ebasco requirements. In effect, a fact finder might find that the quotation itself was sufficient, when compared to the proposed terms of acceptance, to place Ebasco on notice that the terms that it proposed were objectionable.[28] A second instance at which Ebasco might be found by the jury to have been notified of GE's objections, would be upon receipt by Ebasco of a September 24, 1965, letter written by J. A. Urquhart of the GE large steam generator marketing division, suggesting the setting up of appointments to "pursue further the subject of contract conditions. . . ." and suggesting that "any meeting with EBASCO (sic) should now include not only their purchasing people but, more importantly, their lawyers." In light of

§ 2–207(2)'s requirement that notice be given within a "reasonable" time, and in light of the fact that the manufacturing of the unit had commenced only five months before and was to continue for almost two more years, it is possible that notification would still have been reasonably given at this date.[29] Still a third instance, at which a fact finder might find notice to Ebasco had been effectuated would be on May 4, 1967, when Salerno received from GE a detailed proposal for compromise contract terms. Nor do we mean to indicate that these are the only three dates upon which a fact finder might find notification of GE's objections had occurred; rather we merely note these three dates as examples of occasions upon which a fact finder might find that notification had taken place. Until such factual issues were resolved, the applicability of § 2–207(2) (c) could not be determined.

■ Similarly, there exist material issues of fact on the question whether the language of the Ebasco standard terms and conditions materially altered the proposed terms in the General Electric handbook. We are aware of the fact that the language of the two documents in regard to warranties differs.[30]

---

28. *See, e. g.*, Official Comment 6 to § 2–207:
 If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to. *Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself.* As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2). (emphasis added).

29. Indeed, the suggestion in the letter that representatives of GE meet with Ebasco people again, would indicate that negotiations had commenced even before this time.

30. Compare, for instance Paragraph 16 of the Ebasco Supplementary Terms and Conditions:
 16. GUARANTEE

 The Seller warrants to the Purchaser and the Owner that all Equipment furnished under this Order shall be free from defects either in design, material or workmanship and shall be suited in all respects both for the purposes for which it is specified hereunder to be sold and for all other uses for which it may be represented in writing by the Seller to be suited. The Seller also warrants to the Purchaser and the Owner the successful operation of all such Equipment. The Seller shall not be required to correct any defects which may appear in such Equipment after one year from the date it is first put into service, such service to begin within a reasonable time after the delivery of such Equipment. Except to the extent hereinafter in this paragraph otherwise provided, the Seller's liability under this Article No. 16 shall in no case (except

And, as might be expected, several other provisions in the two forms are seemingly in conflict. But we cannot say solely upon reading the bare words of the proposed contracts which changes, if any, are material. We think that this is a determination that could only be made upon a review of all the facts and the circumstances surrounding this multimillion dollar transaction. To make a determination of materiality without resort to the factual context surrounding the deal would fly in the face of the case law [31] and indeed, the official commentary to § 2–207. In the latter regard, we set forth the opening phrase of Note 4 of the Official Commentary to § 2–207:

> Examples of typical clauses which would normally "materially alter" the contract and *so result in surprise or hardship* if incorporated without express awareness by the other party . . . . (emphasis added).

That comment indicates to us that the materiality of a change is to be judged in large part by the expectations of the parties involved in the transaction. That

as to implied warranty of title) exceed the cost of repairing, or of supplying a replacement for, any defective parts or material. If the Equipment furnished under this Order is installed by the Seller and any defect or defects in design, material or workmanship appears within the period of time in this paragraph above set forth, then, in addition to repairing, or furnishing a replacement for, any defective parts or materials, the Seller shall negotiate with the Purchaser and/or the Owner as to the extent of the additional burden or responsibility, if any, that Seller shall assume in completely and satisfactorily correcting any such defect or defects.

The warranties in this Article No. 16 contained assume that the Equipment furnished under this Order, if not installed by the Seller, is properly installed, and that such Equipment is properly used and maintained.

with GE Company Handbook, Large Steam Turbine-Generator Units Section 4710, (Conditions of Sale) (dated May 25, 1964):

WARRANTY

The Company warrants to the Purchaser that the equipment to be delivered hereunder will be free from defects in material, workmanship and title and will be of the kind and quality designated or described in the contract. The foregoing warranty is enclusive and in lieu of all other warranties whether written, oral, or implied (including any warranty of merchantability or fitness for purpose). If it appears within one year from the date of shipment by the Company that the equipment delivered hereunder does not meet the warranties specified above and the Purchaser notifies the Company promptly, the Company shall thereupon correct any defect, including nonconformance with the specifications, at its option, either by repairing any defective part or parts or by making available at the Company's plant, a repaired or replacement part. But if the Company installs the equipment or supplies technical direction of installation, said one year shall run from the completion of installation, provided same is not unreasonably delayed by the Purchaser. The conditions of any tests shall be mutually agreed upon, and the Company shall be notified of, and may be represented at, all tests that may be made. The liability of the Company to the Purchaser (except as to title) arising out of the supplying of the said equipment, or its use, whether on warranty, contract or negligence, shall not in any case exceed the cost of correcting defects in the equipment as herein provided and upon the expiration of said one year, all such liability shall terminate. The foregoing shall constitute the sole remedy of the Purchaser and the sole liability of the Company.

Moreover, the GE Handbook contained a Limitation of Liability clause which read as follows:

LIMITATION OF LIABILITY

The Company's liability on any claim of any kind, including negligence, for any loss or damage arising out of, connected with, or resulting from this contract, or from the performance or breach thereof or from the manufacture, sale, delivery, resale, repair or use of any equipment covered by or furnished under this contract shall in no case exceed the price allocable to the equipment or part thereof which gives rise to the claim, except as provided in the paragraph entitled "Patents." In no event shall the Company be liable for special or consequential damages.

The Ebasco Supplementary Terms and Conditions contained no similar provision.

31. *See, e. g., Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1169 n. 8 (6th Cir. 1972) ( . . . we believe the question of material alteration necessarily rests on the facts of each case. [citation omitted]); *Medical Devel. Corp. v. Industrial Molding Corp.*, 479 F.2d 345 (10th Cir. 1973).

is a determination uniquely within the province of a fact finder and one we are incapable of making on a motion for summary judgment.[32] So then, for all the foregoing reasons, we believe that genuine material issues of fact not only preclude our deciding as a matter of law that a contract came into existence by the exchange of letters and forms in July, 1964 but also our determining what were its terms. By the same token, sufficient issues of facts exist to prevent us from deciding as a matter of law that no § 2–207(1) contract came into existence either.[33]

D. *Issues of Fact Under § 2–207(3)*

■ Section 2–207(3) of the Code provides:

Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

Assuming, *arguendo*, that the writings of the parties did not produce a binding contract, PP&L's § 2–207 contentions require us to determine whether genuine material issues of fact exist on the question of whether the conduct of the parties recognized the existence of a contract. We think such issues do exist. On the one hand, the manfacturing of the turbines apparently began as early as March of 1965, and was well underway, if not near completion when Supplement 16 was executed. As we noted earlier, had GE refused delivery, there would have been a powerful § 2–207(1) or § 2–207(3) argument. On the other hand, the writings of the parties from the time of the original quotation and purchase order in 1964 until agreement upon Supplement 16 in 1967 are replete with references to the lack of a contract between the parties.[34] Whether the conduct of the par-

---

32. We are aware that Official Comment 4 to Section 2–207 includes as an example of a clause which would normally materially alter the contract one "negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches . . . ." Although this may typically be the case, we reiterate our belief that the final determination cannot be made without an examination of the factual circumstances surrounding the entire transaction, an examination we feel more appropriately performed by the fact finder.

33. Because we think unresolved issues of fact remain before it could be determined whether § 2–207(2) is applicable to the letters in question, we need not here discuss the problems presented if a fact finder were to conclude that a § 2–207(1) contract had been created but that the Ebasco acceptance materially altered the GE proposal or, alternatively, that notification of objection to the additional terms was given within a reasonable time. The cases and commentary are far from agreement on the resolution of this problem. There are a number of possible solutions ranging from a contract on GE's terms to one made up in large part of terms dictated by the U.C.C. *See, e. g., Just Born, Inc. v. Stein, Hall & Co.*, 59 Pa.D. & C.2d 407

(C.P., Northampton Co. 1968) (implying that if the additional term materially alters the contract it is disregarded and a contract remains incorporating the terms of the first writing only, here, the GE proposal); Official Comment 6 to U.C.C. § 2–207 (Where notice of objection pursuant to § 2–207(2)(c) is given within a reasonable time, "[t]he contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2)"). *Cf.* Pennsylvania Bar Association Notes to § 2–207, at 12A Pa.Stat.Ann. § 2–207, at 151 ("the parties are bound to a contract which is silent on the disputed point").

34. For example on January 17, 1966, Arthur L. Strang, counsel to GE's large steam turbine department, wrote Charles Read, Ebasco outside counsel, as follows:

I tried to reach you this afternoon, but you have been tied up in conference. As I told your secretary, I am hoping that we can get together in your office on Thursday afternoon to discuss Ebasco contract forms. Mr. Woods McCahill, Counsel for our Electric Utility Sales Operation would also like to be there.

In the meantime I am enclosing a G.E. Draft dated June 24, 1965 of a *Proposed Form of Ebasco Services Purchase Contract*

ties recogized the existence of a contract is a factual determination which, in light of the conflicting evidence in the record before us, should properly be left to a fact finder.

### E. Ebasco's Authority to Bind PP&L to Supplement 16

■ As previously noted, PP&L contends that once a contract was formed pursuant to either § 2–207(1) or (3), Ebasco was stripped of its power to negotiate with GE any further provisions that were to the detriment of PP&L.[35] Two theories are advanced by PP&L in support of this conclusion. First, PP&L contends that having become the third party beneficiary of the § 2–207 contract allegedly formed in 1964 between Ebasco and GE it gained certain contract rights which neither Ebasco nor GE could thereafter affect. Alternatively, PP&L argues that Ebasco—though concededly the agent of PP&L—had no authority to give up terms favorable to PP&L once they were obtained. Those favorable terms are asserted to be those gained by PP&L pursuant to operation of § 2–207 on the exchange of letters in July, 1964. We believe the third party beneficiary argument to be lacking in merit. We believe,

however, that genuine material issues of fact do exist that bar our determining on a motion for summary judgment whether Ebasco possessed either actual, implied apparent or inherent authority to bind PP&L to the terms of Supplement 16.

#### 1. Third-party Beneficiary Status.

■ It is conceded by PP&L that Ebasco was operating as the agent of PP&L at all times here in question.[36] That being the case we cannot see any possible basis for the claim that PP&L could be vested with third party beneficiary rights flowing from the contract allegedly created by operation of § 2–207. Quite simply:

Where the promisee is actually the duly appointed and authorized agent of the person who is to receive the contracted performance, no third party beneficiary situation exists. The parties to the contract are the promisor on the one side and the principal on the other.

L. Simpson, Contract § 117, at 248 (1965). Because PP&L was in fact a principal in any contract negotiated between Ebasco and GE, by definition PP&L could not also be a third-party beneficiary of that same contract.[37]

and Ebasco Services-General Electric General Terms and Conditions. We have had one discussion on these proposals with Messrs. Chase and Salerno at Ebasco. Mr. Sherman of Ebasco has suggested that the next step should be *a discussion between the lawyers for the two companies—at least to reach an understanding regarding the areas where we may be apart.*

As you will see from the enclosed form, it contemplates a separate purchase contract for each order plus a set of General Terms and Conditions that could, if desirable, be printed up and attached to each order. We suggest that some such arrangement as this will expedite the negotiation of the numerous contracts between Ebasco and General Electric. (emphasis added).

The record contains other examples of correspondence which create questions of fact on the existence of a contract by conduct.

35. As we indicated in footnote 33, the question of what terms constituted the § 2–207 (1) contract is a perplexing one which must

await the adjudication of material factual issues at trial before it may be fully answered. But even were we to adopt the interpretation of § 2–207(1) and (2) least favorable to PP&L, (see n. 33 *supra*) i. e., that the § 2–207 contract created was made up of those terms found solely in the GE proposal, it is clear that Ebasco, in negotiating Supplement 16, accepted some modification even more detrimental to PP&L than those found in the original GE proposal. Thus regardless of the ultimate disposition of the § 2–207(2) question, it is clear that to some extent Ebasco was called upon to negotiate away some rights already accruing to PP&L.

36. *See* Memorandum of PP&L in Opposition to Motion of GE for Partial Summary Judgment, at 59.

37. It is possible for a third party (GE) and agent (Ebasco) to exclude the principal from the contract either by the form of the contract or the terms thereof. *See* Restatement (Second) of Agency §§ 292, 293 (1957). Nevertheless, there is a presumption that the principal

### 2. *Ebasco's Power as Agent of PP&L*

#### a. *The Applicable Agency Law.*

We have concluded in Part II of this opinion that the provisions of Supplement 16, if they are binding upon PP&L, are sufficient to absolve GE from liability for cost of replacement power. Because we have determined that PP&L was never a third party beneficiary of the Ebasco-GE agreement, the authority of Ebasco to bind PP&L must be determined by reference to the law of agency.

 The Agent's power to bind his principal may stem from four different sources. The first, express authority, is directly granted to the agent by the principal either verbally or in writing.[38] In this action, express authority flows from the PP&L-Ebasco contract, and from any further communications between those two corporations which may be established by the evidence. A second potential source of Ebasco's authority is "implied authority". Section 35 of the Restatement (Second) of Agency provides:

> Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it.[39]

Questions of express and implied authority are determined by reference to the communications between the principal and his agent.

Apparent authority, the third potential source of Ebasco's power to bind PP&L, is the power an agent gains to bind his principal to a contract with a third party, not as the result of communications between principal and agent, but rather because of manifestations made by the principal to the third party.[40] Here, if GE can show representations made to it by PP&L that lead GE to believe that Ebasco was authorized to negotiate Supplement 16, the possibility of apparent authority would arise.

 Lastly, § 8A of the Restatement (Second) of Agency defines the Inherent Agency Power:

> Inherent agency power is a term used in the restatement of this subject to indicate the power of an agent which is derived not from authority, apparent authority or estoppel, but solely from the agency relation and *exists for the protection of persons harmed by or dealing with a servant or other agent.* (emphasis added).

Section 161 of the same Restatement is a corollary of § 8A, setting forth a specific application of the general § 8A principle:

> A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by

---

(PP&L) is a party to the contract even though the contract is couched in terms dealing only with the agent (Ebasco) and third party (GE), signed only by them and never mentioning the principal (PP&L). *Id.* § 292 Comment *b.* If PP&L is a party to the contract then, as stated in the text; it may not also be a third party beneficiary. If Ebasco and GE had effectively excluded PP&L from the contract, PP&L still could not be a third party beneficiary, as the requirement that the promisor intend to benefit the third party would then remain unfulfilled. Indeed, a third party who induces an agent, to enter into a contract which excludes the principal as a party will normally be liable to the principal for interference with the agency relationship. *Id.* § 293 Comment *c.*

**38.** *See* Restatement (Second) of Agency § 7, Comment *c* at 29 (1958); *Hartley v. UMW Local 6321,* 381 Pa. 430, 113 A.2d 239, 246 (1955).

**39.** Section 35 has been adopted as the law in both New York and Pennsylvania. *Compare Burke v. Bonat,* 255 N.Y. 226, 229, 174 N.E. 635 (1931), *with Starling v. West Erie Ave. B. & L.,* 333 Pa. 124, 3 A.2d 387, 388 (1939).

**40.** *Compare Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407 (1968), *with Ford v. Unity Hospital,* 32 N.Y.2d 464, 472, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973).

the principal, *the other party reasonably believes that the agent is authorized to do them* and has no notice that he is not so authorized. (emphasis added).[41]

Where a third party and a principal are held bound to a contract by an agent's apparent or inherent authority, recovery by a principal against his agent for damages occasioned by the agent's breach of his actual or implied authority is not foreclosed.[42] With these principles in mind we approach the question of Ebasco's authority to negotiate Supplement 16.

### b. *The Factual Background*

The contract executed by PP&L and Ebasco contains the following grant of express authority relevant to this litigation:

II. A. Ebasco shall, at its own cost and expense, design engineer, construct and install the Project, and for this purpose shall furnish any and all design and engineering services and supervision, all facilities, equipment and material, and all supervision and labor necessary for the completion of the Project, within the time and on the terms and conditions provided for in this agreement.

. . . . . .

B. The Permanent Project Equipment described in Appendix D shall be provided by Ebasco with its own

funds from among the list of bidders set forth in Appendix E. For this purpose Ebasco shall, in a good, substantial and workmanlike manner, in strict accordance with the requirements of all municipal, state or federal authorities having jurisdiction in the premises and at its cost and expense, perform the following services:

1. Prepare inquiry specifications and transmit them to PL at the time of issuance of the inquiry.

2. Prepare inquiries, solicit quotations, analyze and evaluate bidders' proposals and advise PL of Ebasco's selection of a vendor and of the proposed date of purchase commitment.

3. Prepare and issue all purchase orders and necessary supplements thereto.

. . . . . .

7. Prepare and furnish to PL periodic reports on the status of production of equipment and material purchased.

. . . . . .

10. Secure fulfillment of purchase order contracts in accordance with the provisions thereof.

11. Perform any and all other services and functions which may be necessary in order to initiate and complete the purchase and timely delivery of Permanent Project Equipment conforming to

---

41. Section 161 is clearly the law in Pennsylvania. *See, e. g., Rednor & Kline, Inc. v. Department of Highways*, 413 Pa. 119, 124, 196 A.2d 355, 358 (1964); *Diuguid v. Bethel African Meth. Church*, 119 Pa.Super. 493, 497, 180 A. 737, 738 (1935); *Anthony P. Miller, Inc. v. Needham*, 122 F.2d 710, 712–13 (3d Cir. 1941); *Waldron v. Aetna Cas. & Sur. Co.*, 141 F.2d 230, 234–35 (3d Cir. 1944). Its status in New York is less certain as we have not been able to find a case expressly adopting it as the law of New York. *Cf. Lind v. Schenley Ind. Inc.*, 278 F.2d 79, 85 (3d Cir. 1960). The Appendix to the Restatement (Second) of Agency does cite

one case, *Lightbody v. North American Ind. Co.*, 23 Wend. 18 (N.Y.1840), where a New York court bound the principal to the unauthorized act of its agent though no evidence of apparent authority existed. *But cf., Ford v. Unity Hospital*, 32 N.Y.2d 464, 472, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973):

One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.

42. *Cf.* Restatement (Second) of Agency §§ 399–401 (1958).

specifications and bearing appropriate warranties and guarantees.

．　．　．　．　．　．

In purchasing Permanent Project Equipment, Ebasco shall in all cases use its best efforts to obtain for PL warranties against defects in design, workmanship and materials, the most favorable possible guarantees of performance, and the most favorable possible indemnifications against the consequences of patent infringement, recognizing that the Contract Price is based upon obtaining customary warranties and guarantees and that appropriate adjustments will be made, pursuant to change order as provided in Section II, Paragraph E hereof, to cover increased costs, if any, of equipment occasioned by obtaining the most favorable possible guarantees. It shall also, at PL's request and at no extra charge, assist PL in enforcing such warranties, guarantees and indemnifications.

### c. Discussion

 It is our perception that were it not for the interposition of the § 2–207 claims there would be no dispute that Ebasco was given authority by PP&L to handle Brunner Island #3 from design to ground-breaking to ribbon-cutting. Thus, if the § 2–207 problem were not subsumed within the factual complex of this case, PP&L could not seriously be heard to argue that Ebasco was without power or authority to negotiate Supplement 16. But given the possibility that a § 2–207 contract was created, we are faced with the question of whether Ebasco had the authority to negotiate downward, as it were, from the more favorable terms it had supposedly obtained pursuant to § 2–207.[43] We have found the latter question troubling, framed as it is in a summary judgment motion context, because of our initial difficulty in envisioning what probative evidence could possibly be adduced on the question of what authority Ebasco had to negotiate away favorable terms of a § 2–207 contract, where it cannot assuredly be posited that Ebasco knew such a contract existed.[44] However, the initial difficulty recedes when it is perceived that the source of the previously obtained terms is irrelevant to the outcome; in other contexts they might derive from a unitary writing rather than from § 2–207. In any event, if, on the basis of such evidence as may be developed on the subject, a fact finder determines that Ebasco's authority included the power to negotiate away already obtained terms, a not unlikely possibility given Ebasco's comprehensive turnkey responsibilities, then the § 2–207 dialogue, however intricate it may be, becomes a "straw man" which has been knocked down and Supplement 16 prevails. Against this background, the various principles of express, implied, apparent and inherent authority as applied to the issues on this summary judgment motion will appear in sharper relief.

We recognize that, in general, the question of the scope of authority created by a written instrument is for the court.[45] However, although the general

43. We are cognizant of GE's forceful argument that Supplement 16 represents the product of long negotiations as a result of which both parties were required to give as well as take. We discuss that argument *infra*, nn. 45–47 and accompanying text.

44. Our qualms are exacerbated because of our realization that were we to decide *as a matter of law* at this juncture that Ebasco lacked the implied authority to bind PP&L to Supplement 16, then PP&L's claim against Ebasco for breach of the agency contract would be strengthened before Ebasco had ever been heard on the point. We note too that the factual underpinning of the problems which we face in this section of the opinion are inextricably intertwined with PP&L's claim that GE used its influence over Ebasco to tortiously interfere with Ebasco's contractual and fiduciary duties to PP&L, as evidenced by Ebasco's consent to Supplement 16.

45. *See, e. g., Maslo Mfg. Corp. v. Protector Elec. Co.*, 376 Pa. 553, 103 A.2d 743, *cert. denied*, 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648 (1954).

framework of the relationship of the parties points in the direction of a declaration that Ebasco possessed implied, inherent and/or apparent authority to bind PP&L to Supplement 16, and although the existence of issues of fact is less than pellucid, we believe that there do exist genuine issues of material fact which preclude our determining as a matter of law the power vested in Ebasco by the PP&L-Ebasco agency contract. In so holding, we address our discussion mainly to the areas of implied and inherent authority. The express grant of authority to Ebasco does not cover the situation, and the existence of apparent authority turns on matters not in the record, and of a type rarely susceptible to treatment on summary judgment. Whatever apparent authority existed that would have permitted Ebasco to negotiate Supplement 16 must be distilled from communications and manifestations made by PP&L to GE. Thus, if at any time during the course of the Supplement 16 negotiations between Ebasco and GE, PP&L made representations to GE that reasonably could have caused GE to believe Ebasco authorized to conduct the negotiations, then a fact finder could properly find that Supplement 16 was a part of the contract and binding upon PP&L. We are aware of the contents of the affidavit submitted on behalf of GE in its attempt to obtain summary judgment on the tortious interference issue, to the effect that GE was completely unaware of the terms of the agency contract between PP&L and Ebasco.[46] But that affidavit does not preclude the possibility of oral representations, nor does it bar the possibility that PP&L's inaction in the face of known contract difficulties, may have been sufficient to create apparent authority in Ebasco. Because such issues of fact remain to be determined, we believe that the question of apparent authority is best left to the fact finder to resolve at trial. On the issues of implied authority, we take cognizance of § 33 of the Restatement (Second) of Agency and of Comment *b* thereto:

> An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do *in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts.* (emphasis added).

> Comment *b*. Authority distinct from contract of agency. An agent is a fiduciary under a duty to obey the will of the principal as he knows it or should know it. This will may change, either with or without a change in events. Whatever it is at any given time, if the agent has reason to know it, his duty is not to act contrary to it. The fact that in changing his mind the principal is violating his contract with the agent does not diminish the agent's duty of obedience to it. Hence the rule applicable to the interpretation of authority must be as flexible as the will of the principal may be. Thus, whether or not the agent is authorized to do a particular act at a particular time depends, not only on what the principal told the agent, but upon a great variety of other factors, including changes in the situation after the instructions were given. The interpretation of authority, therefore, differs in this respect from the interpretation of a contract, even the contract of agency.

When PP&L and Ebasco first negotiated the agency contract, they did not cover

---

46. The affidavit was submitted by Arthur I. Strang, who at the time of the Supplement 16 negotiations was attorney for the GE Large Steam Turbine-Generator Department located in Schenectady, New York. Paragraphs 3 and 5 of that affidavit aver:

3. At no time during my negotiations with representatives of Ebasco did I, or, to my knowledge, did any other GE personnel, have any knowledge of the terms of the contract between Ebasco and PP&L.

5. No attempt was made to breach the contract between Pennsylvania Power and Light Company and Ebasco, nor did any representative of Ebasco indicate that any term that I was urging on behalf of GE would cause Ebasco to breach its contract with PP&L.

the situation that arose when Ebasco and GE were unable to agree on the terms of the sale of the turbine generator unit. In such a situation, Comment *b* indicates that Ebasco's authority should be measured in light of the circumstances prevailing at the time the difficulties in negotiating Supplement 16 were encountered. As we indicated previously, it is difficult to determine when viewed ten years later whether a § 2–207 contract existed while the Supplement 16 negotiations were proceeding. Whether Ebasco could reasonably have determined that one did exist, and whether, if one did, Ebasco could reasonably have been led to believe that PP&L would therefore have forbade the negotiation of Supplement 16 is a question for the trier of fact. Further, the fact finder would also have to take into account GE's forceful contentions that Supplement 16 was not a "downward" negotiation for PP&L but, rather, a quid pro quo.

Finally, we perceive issues of fact that preclude our determining on a motion for summary judgment whether Ebasco possessed inherent authority to bind PP&L to Supplement 16. Sections 8A and 161 seem to reflect an attempt by the courts to insure an equitable result in situations where traditional con-

cepts of agency law might fail to do so. The essence of the sections is a policy judgment best expressed in Comment *a* to § 161:

> [The liability] is based primarily upon the theory that, if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when such an agent, although without authority to do so, does something which is usually done in connection with the transactions he is employed to conduct . . . .
>
> . . . . . . .
>
> . . . . In the long run it is of advantage to business . . . that third persons should not be required to scrutinize too carefully the mandates of permanent or semi-permanent agents who do no more than what is usually done by agents in similar positions.[47]

While we cannot foresee the precise nature of proof on this issue, it would seem that the fact finder could consider in addition to the facts concerning the relation between Ebasco and PP&L, the practice in the construction industry relating to authority given to turnkey contractors with respect to specifications, change orders, and general con-

---

47. Comment *a* to § 8A of the Restatement (Second) of Agency is of similar import:
. . . . Although the agency relation may exist without reference to mercantile affairs, . . . its primary function in modern life is to make possible the commercial enterprises which could not exist otherwise. The common law has properly been responsive to the needs of the commerce, permitting what older systems of law denied, namely a direct relation between the principal and a third person with whom the agent deals, even when the principal is undisclosed. Partnerships and corporations, through which most of the work of the world is done today, depend for their existence upon agency principles. The rules designed to promote the interests of these enterprises are necessarily accompanied by rules to police them. It is inevitable that in doing their work, either through negligence or excess of zeal, agents will harm third persons or will deal with them in unauthorized ways. It would be unfair for an enterprise to have the benefit of the work of its agents without making it responsible to some extent for their excesses and failures to act carefully. The answer of the common law has been the creation of special agency powers or, to phrase it otherwise, the imposition of liability upon the principal because of unauthorized or negligent acts of his servants and other agents. These powers or liabilities are created by the courts primarily for the protection of third persons, either those who are harmed by the agent or those who deal with the agent. In the long run, however, they enure to the benefit of the business world and hence to to the advantage of employers as a class, the members of which are plaintiffs as well as defendants in actions brought upon unauthorized transactions conducted by agents.

tractual terms and conditions. The evidence might elucidate the question of whether turnkey contractors have plenary power to give up beneficial contractual provisions without consideration. On the other hand, there may be introduced evidence that sometimes a turnkey contractor will give up previously won benefits only where the supplier is willing to make concessions as well. In this instance, GE has forcefully contended that the final draft of Supplement 16 represents a true quid pro quo; if of course the fact finder so finds, that conclusion could also be used to support Ebasco's authority.[48]

We also note in this regard that the policy reflected in the Comment to §§ 8A and 161 of the Restatement[49] lays great stress upon promoting regularity in mercantile affairs by protecting the reasonable expectations of the third parties who deal with the agents of known principals. This policy, which has become part of the law and would have to be reflected in adjudicating such issues either by way of a jury charge or a non-jury judge's consideration, would doubtless prove helpful to GE's position that PP&L is bound by Supplement 16. In any event, we perceive no reason why the result should differ if the original contract was created by operation of law pursuant to § 2-207 rather than by writing.[50] In either case the question remains as to whether the power to agree to a material alteration of a building contract either with or without consideration was one of the powers which usually accompanied or were incidental to transactions engaged in by turnkey contractors. To answer that question will require an examination of all of the facts and circumstances surrounding the transaction; thus the determination must be left to the fact finder.[51]

While the factual background of this case is sufficiently unusual to make it unlikely that close precedent will be found, there is a Pennsylvania case which is most instructive, *Diuguid v. Bethel African Meth. Episc. Church*, 119 Pa.Super. 493, 180 A. 737 (1935). In *Diuguid* plaintiff was retained by the defendant church to do certain plastering and painting on the church premises. That agreement was consummated by way of a written contract. The church was governed by a board of nine trustees, three of whom constituted members of the house or building committee and who were therefore charged with overseeing the painters work on the building. Plaintiff alleged that during the course of his work, he entered into an oral contract with the members of the building committee pursuant to which he painted an additional portion of the church for the sum of $228. The oral contract was denied by the members of the building committee. Moreover, the church contended that even if such an oral contract had been negotiated the building committee was without power to bind the church to it. Apparently undisputed was testimony that only the entire nine member board of trustees could, pursuant to the church by-laws, bind the church to a contract. Nor was any evidence introduced of any representations made by the board to plaintiff that might reasonably have led him to believe that the building committee possessed the power to enter into an additional contract. A verdict was returned by a jury in favor of the plaintiff, evidently having found both that the oral contract was created and that the church was bound by the actions of

---

48. We reiterate that at trial the apparent authority route used earlier would also be available to GE to establish Ebasco's power to bind PP&L.

49. See n. 44 and accompanying text.

50. Of course, if no § 2-207 contract was formed either by exchange of letters during

1964 or by subsequent conduct, then the question of authority is mooted, for PP&L could not seriously contend that Ebasco would not have had authority to execute Supplement 16 if no prior contract existed.

51. *Anthony P. Miller, Inc. v. Needham*, 122 F.2d 710, 713 (3d Cir. 1941).

its building committee. On appeal, the Superior Court affirmed:

> The testimony shows that the only persons with whom plaintiff dealt were the pastor of the church and the three members of the board of trustees, known as the house or building committee, a designation which implied they had charge of the maintenance of the church building. At all times while the work was in progress one of the members of this committee was present, watching the plaintiff and overseeing the work. From this testimony it is a reasonable inference that the other trustees left the matter of the repair and decoration of the church building entirely in the hands of the house committee and the pastor. Under these circumstances, plaintiff had a right to infer that these men, members of the governing board of the church, had full authority to make contracts on its behalf relating to the work he was doing.

119 Pa.Super. at 496, 180 A. at 738.

We perceive striking similarities between *Diuguid* and the case at bar. In *Diuguid* the third party dealt solely with the members of the building committee, never with the board of trustees; here, GE dealt solely with Ebasco, never with PP&L. At all time *Diuguid's* work was overseen by a member of the building committee, never by any other member of the board of trustees; GE's work was always supervised by Ebasco, never by PP&L. From the testimony in *Diuguid* it reasonably could be inferred that the other trustees left control of the repair of the church solely in the hands of the building committee; from the facts before us a fact finder might well infer that the matter of the construction of Brunner Island #2 was left solely in the hands of Ebasco.

### d. *Conclusion*

We have concluded that the question of Ebasco's authority to bind PP&L to the terms of Supplement 16 is a matter that must be left to trial.[52] The foregoing exegesis of § 2–207 and of the law of agency are extensive, yet the matters therein at issue represent but a minor aspect of this litigation. Because, as we have noted above, a speedy resolution of these limited questions might facilitate the ultimate resolution of the entire litigation, we originally had intended to list for early trial the question of Ebasco's authority, be it express, implied, apparent, inherent or non-existent, to enter into Supplement 16. However, further reflection led us to the realization that a proper resolution of the authority issue rests in part upon a determination of the § 2–207 contentions, for, without an adequate understanding of what, if anything, Ebasco and PP&L obtained pursuant to § 2–207, a fact finder would be unequipped and

---

52. GE has also argued that PP&L's failure to repudiate the terms of Supplement 16 immediately after being notified of them by Ebasco effects a ratification of Supplement 16 by PP&L and binds that company to its terms. Although it is true that in some circumstances a failure on the part of a principal to repudiate promptly his agent's unauthorized actions may bind the principal to them, see Restatement (Second) of Agency § 94, as was stated in *Schwartz v. Mahoning Valley Country Club*, 382 Pa. 138, 142, 114 A.2d 78, 80 (1955):

> The question of ratification could not arise in the absence of proof that the [principal] had full knowledge of all the material facts and circumstances attending the transaction intended to be ratified, for the doctrine presupposes knowledge of such facts.

We agree with PP&L that the record discloses material issues of fact as to whether PP&L was fully apprised as to all circumstances relevant to its alleged decision to ratify. Thus, if PP&L was ignorant of the fact that GE had allegedly accepted Ebasco terms for several years before protesting, or that GE had accepted Ebasco terms in several other contracts negotiated at about the same time, or that Ebasco had compromised some of what it otherwise might have obtained in order to develop a standard contract, such ignorance would lead to the conclusion that PP&L could not meaningfully have ratified Supplement 16, because such knowledge would seemly be crucial to an intelligent and informed decision.

ill-advised to attempt to determine whether Ebasco had the requisite authority to give up what it did. The importance of what Ebasco conceded, which plainly must bear on Ebasco's authority to do so, may well be understood only when taken in conjunction with that which was originally gained. As we have noted above, we realize that if it were to be determined that Ebasco lacked express or implied authority to execute Supplement 16, such a determination might expose Ebasco to liability to PP&L for the damage caused to it as a result of its being held bound to Supplement 16. For this reason Ebasco might also wish to brief and participate in the trial of the authority issue.

We have sketched out above the contours of a potential preliminary trial on the § 2–207 and authority issues. Such a trial might well include the tortious interference issue and such other contractual issues as remain anywhere in the case (and which survive the remaining partial summary judgment motions of Foster Wheeler, Combustion, and GE. As noted, the special pre-trial conference set for September 8, 1975, will explore the prospect of such a trial with the parties.

### IV. *Is There a Genuine Issue of Material Fact on the Question Whether GE Tortiously Interfered with the Contractual and/or Fiduciary Relationship Between PP&L and Ebasco?*

#### A. *Introduction*

PP&L argues that GE tortiously interfered with two alleged sets of contract rights: (1) the rights accruing to PP&L under its contract with Ebasco and, (2) the rights obtained by PP&L as the third party beneficiary of the § 2–207 contract allegedly formed pursuant to operation of law in 1964. In the preceding section of this opinion we concluded that PP&L could not have been a third party beneficiary of a contract entered into by its agent. Having done so, it follows *a fortiori* that GE could not have interfered with any such rights. We believe, however, that genuine issues of material fact exist on the first question and will therefore deny GE's motion for summary judgment on that issue.

The tort of tortious interference is recognized in Pennsylvania and New York:

> [o]ne who, having knowledge of an existing valid contract between others, intentionally, knowingly, and without reasonable justification or excuse, induces one of the parties to the contract to breach it to the damage of the other party, is liable in an action to recover the damages suffered. The action is predicated on the intentional interference without justification with contractual rights, with knowledge thereof. Such interference constitutes a legal wrong, and, if damages result therefrom, a valid cause of action exists therefor.

*Klauder v. Cregar,* 327 Pa. 1, 7–8, 192 A. 667, 670 (1937), quoting *Hornstein v. Podwitz,* 254 N.Y. 443, 173 N.E. 674 (1930). In addition, § 312 of the Restatement (Second) of Agency renders liable to a principal one who "without being privileged to do so intentionally causes or assists an agent to violate a duty to his principal." Obviously, where the agency relationship is created by contract the two principles are virtually indistinguishable,[53] and except where indicated otherwise we will treat them as such.

The crux of PP&L's tortious interference claim lies in its contention that GE in negotiating with Ebasco the terms of Supplement 16 caused Ebasco to negotiate not only with respect to its principal, PP&L, but also with respect to other public utilities for which Ebasco was currently or would in the future be

---

53. The most significant exception may exist when the question of privilege to act arises.

*See* discussion, *infra,* note 61 and accompanying text.

constructing power generating units. The factual background of PP&L's contentions are as follows. On September 24, 1965, GE notified Ebasco by means of a letter from J. A. Urquhart, GE Area Sales Manager that it was requesting a meeting to discuss contract conditions not yet agreed upon. At the same time, GE and Ebasco were apparently involved in litigation involving a turbine generator furnished by GE for use by the Kansas City Power and Light Company. Apparently, several of the issues involved in this litigation had also arisen in the Kansas City Power and Light litigation and it was with a view toward resolving both sets of questions that the meeting was called. However, the parties were unable to resolve their differences at this time and negotiations continued, allegedly in regard to both the Kansas City and Brunner Island problems, through October of 1967. By that time Ebasco was faced with other difficulties which PP&L now claims allowed GE to exert leverage upon Ebasco. Construction on Brunner Island was behind schedule and delivery of the turbine generator had been delayed. Moreover, further delay in delivery of the turbine generator would have resulted in an increase in price for that equipment to Ebasco, a cost that could not be passed on to PP&L. Additionally, GE and Westinghouse Electric Company were were apparently the only domestic manufacturers of this type of equipment and Westinghouse was incapable of manufacturing the generator in the short period of time remaining. Thus, if Ebasco wished to complete its obligations within the time period allowed by its contract with PP&L it was incumbent upon it to reach agreement with GE immediately.

PP&L does not contend that Supplement 16 was obtained in an unconscionable manner so as to render it void as a matter of law. PP&L does contend that GE, knowing of the penalties for which Ebasco would become liable if work was not completed on time and of Ebasco's need to maintain a suitable working relation with GE in light of the frequent dealings between the two, exerted substantial pressure upon Ebasco to, once and for all, take care of the contract problems between the two even at the expense of strict loyalty to its current principal. The rights allegedly interfered with may alternatively be expressed as either those created by the written provisions of the PP&L-Ebasco contract or the duty of loyalty to the principal owed by the agent pursuant to the Restatement (Second) of Agency § 387.[54] In order to deny GE's motion for summary judgment on the tortious interference question, we must find that there exists a genuine issue of fact on each of the following matters.

B. *Did GE Have Knowledge of the Rights with which They are Alleged to Have Interfered?*

 *Klauder v. Cregar, supra,* is explicit in requiring that the offending party have knowledge not only of the existence of the contractual relationship, but also of the terms of that contract which conferred upon the claimant the rights allegedly interfered with. We believe that there is a material issue of fact on this issue for two reasons. First, we note the deposition of J. Ben Monk, District Sales Manager for GE. Mr. Monk testified that Robert Davis, a GE Power Generation Engineer, had determined at the time of the Supplement 16 negotiations the authority of Ebasco to act for PP&L.[55] We think

54. That section provides:
 Unless otherwise agreed, and agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.
 The strictness of this duty may be seen in Comment *b* which provides, *inter alia,* "[the agent's] duties of loyalty to the interests of

his principal are the same as those of a trustee to his beneficiaries. See the Restatement of Trusts, § 170."

55. GE strenuously asserts that the mentioned deposition indicates only that Mr. Davis had ascertained that Ebasco was acting as an agent for PP&L, not the terms of the agency

this testimony sufficient to create a question of fact on GE's knowledge of the terms of the PP&L-Ebasco contract. In addition, we believe that because GE was aware of the principal-agent relationship existing between Ebasco and PP&L,[56] it was bound as a matter of law to know of the duty of loyalty imposed upon Ebasco to operate only in the interests of its principal, PP&L.[57] We believe a fact finder could find that GE was aware it was violating PP&L's contract rights if it were to determine that GE was aware of the principal-agent relationship existing between PP&L and Ebasco and concurrently aware that it was inducing Ebasco to negotiate on behalf of several principals at one time.

### C. Did GE Act with the Purpose or Intent to Harm PP&L?

As was aptly noted in *Glenn v. Point Park College*, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971):

> It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does *for the purpose of causing harm* to the plaintiff. As proposed comment *d* to the Tentative Draft of § 766A of the *Restatement (Second) Torts* emphasizes, "The defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it." In the words of a leading text, "The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract." *

We must then decide whether there exists in the record a genuine issue of material fact on the question whether GE acted with the intent to harm PP&L. We believe that there does. For example the depositions of both Arthur Strang, GE Counsel for the Large Steam Turbine Division, and George Cox, Manager of Marketing in the same division, are clear indications that GE was attempting to negotiate a "prototype" contract with Ebasco that would serve as the form to be used in all future dealings with that company.[58] Though this is, of course, not outright evidence of intent to harm, we think that rarely if ever will a tortious intermeddler memorialize his intent. Rather, we think that a jury—if it found that GE was aware of the rights vested in PP&L by the agency contract and had then negotiated a "prototype" contract—could infer that the motivation for GE's actions was to benefit itself at the expense of PP&L. We are aware that GE vigorously protests that in negotiating Supplement 16 it gave up many rights that it previously possessed; i. e., that Supplement 16 represented a true quid pro quo, and that such good faith negotiation must therefore remove any question of intent to harm PP&L. While we think that there may be merit to GE's position, our function on a motion for summary judgment is to determine only if questions of fact exist—not to resolve them.[59]

---

contract. Unfortunately, Mr. Davis is now deceased and cannot resolve that ambiguity for us. We believe the proper course is to leave resolution of the ambiguity to the fact finder. In addition, it may be that a showing that GE was aware that the agency relationship existed is all that would be required to vest them with knowledge of the rights interfered with. See notes 53–54 and accompany text.

56. GE does not dispute this fact and the record is quite clear on it.

57. Pennsylvania and New York both accept as their law the agent's duty of loyalty to its principal. *See Kribbs v. Jackson*, 387 Pa.

611, 618, 129 A.2d 490, 494 (1957); *Elco Shoe Mfrs., Inc. v. Sisk*, 260 N.Y. 100, 183 N.E. 191 (1932).

* Harper & James, *The Law of Torts*, § 6.11, at n. 5 (1956).

58. We do not mean to indicate that this is the only evidence in the record of GE's intent, but use it to explicate our consideration of this question.

59. *See, e. g., Toebelman v. Missouri-Kansas Pipe Line Co.*, 130 F.2d 1016, 1018 (3d Cir. 1942); *Bohn Alum. & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962); 6 J. Moore, Federal Practice ¶ 56.11, at 2143 (1974); Fed.R.Civ.P. 56.

### D. Was PP&L Harmed by the Alleged Interference?

There is little serious dispute that if GE did induce Ebasco to modify its contractual demands in an attempt to achieve a prototype contract, that PP&L was thereby harmed for as a result it was forced to expend substantial sums for, among other items, cost of replacement power—a responsibility that might otherwise have been GE's.[60]

### E. Was GE Privileged to Act as it Did?

*Glenn v. Point Park College, supra,* is also helpful in elucidating this problem:

> The absence of privilege or justification in the tort under discussion is closely related to the element of intent. As stated by Harper & James, *The Law of Torts,* § 6.11, at 513[–14]:
> " . . . where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability." What is or is not privileged conduct in a given situation is not susceptible of precise definition. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged." (citations omitted).

*Glenn v. Point Park College,* 441 Pa. 474, 482, 272 A.2d 895, 899 (1971). *Glenn* involved preliminary objections to the complaint on the grounds of failure to state a cause of action. Plaintiff, a real estate broker, alleged that a prospective purchaser whom the broker put in touch with a prospective seller had gone ahead and dealt directly with the seller thus costing the broker his commission. The Supreme Court of Pennsylvania, noting that the case was before it on the pleadings, felt it inappropriate to decide the privilege question at that point remarking, "[w]ithout more *facts* in hand, we deem it unwise to speculate." (emphasis added).

We think the question of privilege in this situation is a question for the fact finder. In many ways we think the problem to be the opposite side of the coin from the "intent to harm" requirement. Thus, if a fact finder were to find that GE was negotiating in good faith in an effort to protect its legitimate business interests, (that is its position), it might well find both a lack of specific intent to harm and the existence of a privilege to so act.[61] On the other hand, the questions of the good faith and purpose of GE in inducing Ebasco to negotiate on an industry-wide basis are for the fact finder to decide, and not appropriate for summary judgment. In this regard we note Comment *a* to § 312 of Restatement of Agency which provides in part:

> One who is not a parent or guardian of a minor servant is *never* privileged

---

**60.** PP&L also contends that the harm is partially calculable in terms of $50,000 for which sum GE offered to use the superintendence of erection clause rather than the technical direction of installation clause and $300,000 for which sum GE was willing to remove the limitation of liability clause.

**61.** PP&L is incorrect when it cites *Barlow v. Brunswick Corp.,* 311 F.Supp. 209 (E.D. Pa.1970) (Lord, C. J.), for the proposition that protection of a previously formed contract is necessary to assert a claim of privilege. *Barlow* holds only that protection of a prior contract is sufficient to invoke a claim of privilege, not that it is necessary. Because GE does not claim to have been acting to protect a previously formed contract, but rather merely in the pursuance of its general business interests, we have no need to examine the *Barlow* holding further. On the other hand, we note that PP&L is correct in asserting that most cases sustaining a claim of privilege do have prior contracts being protected. *See, e. g.,* Judge Learned Hand's opinion in *Hendler v. Cuneo Eastern Press, Inc.,* 279 F.2d 181 (2d Cir. 1960).

## 456

to use tortious means to terminate even a voidable contract of employment or an employment terminable at will. *Likewise one is not privileged, by persuasion, bribery or otherwise, to cause a servant or other agent to violate any of his duties of loyalty.* (emphasis added.)

Although we will not rule upon this matter until trial, we note the possibility that GE is precluded by Comment *a* and particularly Illustration 2 thereunder[62] from asserting a defense of privilege to PP&L's claim of tortious interference with the agency relationship.

In consideration of the foregoing opinion, we enter the following order.

---

62. The illustration is as follows:

> 2. T, a competitor of P, pays A, P's agent, $100 per week upon A's agreement that A will improperly perform his duties to P. T *is* subject to liability to P for any harm to P's business caused by A's improper performance of duties.